UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------X
CALDER SEACARRIER CORP.,

        Plaintiff,                  07 CV 6520 (LAK)

- against –

VIKING MARINE S.A. and SINORICHES GLOBAL
LTD. a/k/a SGL SHIPPING LIMITED,

        Defendants.
-----------------------------------------------------------X

This is the paginated bundle, exhibit "KS1" referred to in the declaration of KISHORE SHARMA herein dated 4th January 2008

Signed _____
KISHORE SHARMA

At 72 Leonard Street, London, EC2A 4QX, United Kingdom, this 4th day of January 2008

<u>**IN THE MATTER OF THE ARBITRATION ACT 1996**</u>
**AND**
<u>**IN THE MATTER OF AN ARBITRATION**</u>
**B E T W E E N:-**

**CALDER SEACARRIER CORP.**
<u>**Claimants**</u>

**and**

**SINORICHES GLOBAL LIMITED**
<u>**Respondents**</u>

**MV "VERA" FIXTURE DD 07.06.07**

<u>**CLAIM SUBMISSIONS**</u>

[*References in bold in brackets herein are to pages in the bundle of supporting documents served herewith*]

1. By a voyage charter ("the Charter") made and/or evidenced by a recap email dated 6th June 2007 (**1-8**) from brokers to the Claimants, Viking Marine SA ("Viking") agreed to let their vessel the "VERA" ("the Vessel") to the Claimants for the carriage of up to a full and complete cargo of lawful generals/foodstuff/minerals/steel from ports in the Claimants' option in the China/Singapore range to ports in the Claimants' option in the Mediterranean range for the freight on the other terms and conditions therein set out and/or thereby incorporated, including the Claimants' pro forma "MV ABEER S" charterparty (**9-19**) which provided inter alia that: "(By additional clause 25) [**13**]…[A]t charterers option, Master to authorize in writing the charterers agents to sign on his behalf the Bills of Lading".

1

2. By a contract of affreightment and/or fixture and/or booking note ("the Fixture") made and/or evidenced by a recap email via brokers dated 7th June 2007 ("the Fixture Recap") (**20-22**) the Claimants agreed to furnish the MV "VERA" to the Respondents for the carriage of a part-cargo of 20,000-21,000 mts steel products (at the latter's option) from Changshu to Ravenna for the freight of US$ 74 per mt and on the other terms and conditions therein set out and/or incorporated.

3. The Fixture Recap provided and accordingly there were express terms of the Fixture and/or the Fixture on its true construction provided, that:

    (1) "frt usd 74 per mt or per cbm whatever is greater fios lsd payable 100 pct in usa currency to ows nom bank/acc within 5 bd afer compl loading. Congen bs'l to be issued..." (**20**);

    (2) "...arbitration London/english law to apply"(**20**);

    (3) "owise gcn 94 with 3.75 pct address..."(**21**)

4. Further, the Gencon 1994 form as incorporated into the Fixture provided and accordingly it was express term of the Fixture that:

"[By clause 8] **Lien Clause**
[The Claimants] shall have a lien on the cargo and on all sub-freights payable in respect of the cargo, for freight, deadfreight, demurrage, claims for damages and for all other amounts due under this Charter Party including costs of recovering the same"

5. Further, there were implied terms of the Fixture (to be implied as an obvious inference from the circumstances and/or for reasons of business efficacy and/or by law) that:

   (1) the Respondents would not pay any freight that was due to the Claimants under the Fixture to any third party, including Viking.

   (2) the Respondents would in no way act or omit to act, so as to frustrate or defeat any lien of the Claimants.

6. Pursuant to the Fixture, the Vessel proceeded to Changshu and there loaded a chargo of 21,472.244 mts of steel products in the Respondents' option ("the Cargo"). Completion of loading was at 1320 hrs local time on 30th June 2007. The Master, having pursuant to the Charter duly given written authorization to the Claimants' appointed agents at Changshu, (Penavico Changshu Agency, "Penavico") to sign bills of lading on his behalf **(23)**, in the premises only Penavico could sign and issue valid bills of lading in respect of the Cargo.

7. In the premises, the Respondents became liable to pay the Claimants within 5 banking days after 30th June 2007, freight in the sum of US$ 1,529,360.53 (being 21,472.244 x US$74 LESS address commission at 3.75% of US$59,585.475). Further, pursuant to the term set out in

paragraph 4 above, the Claimants became entitled to a lien over the Cargo and/or the bills of lading issued by Penavico in respect thereof.

8. Save for the sum US$131,261.13 the Respondents have failed and refused to pay the Claimants the freight due and owing as pleaded in paragraph 7 or any freight and accordingly the sum of US$1,398,099.40 remains so due and owing from them to the Claimants. Rather, in breach of the Fixture on about 17th and/or 18th and/or 19th July 2007, the Respondents have paid monies in the total sum of US$1,398,099.40 to Viking.

9. Further, as it is entitled to do, at all material times since about 30th June 2007 the Claimants have exercised their lien over the Cargo and/or the bills of lading relating thereto by, inter alia:

   (1) (through their agents Penavico) retaining under their possession and/or custody and/or control the draft bills of lading prepared by Penavico pursuant to the Charter and/or by instructing Penavico not to issue the same (**27, 29, 39, 43A-B**). For the avoidance of doubt, as at the date hereof no bills of lading have been issued by Penavico in respect of the Cargo;

   (2) on 7th September 2007 serving Notices of its Lien (**48-100**) on Sinoriches and shippers, consignees and notify parties named on

the draft bills of lading that had been prepared (but not issued) by Sinoriches.

10. The Vessel is expected to arrive at Ravenna with the Cargo on about or after 20th September 2007. In the circumstances the Claimants apprehend that, in breach of the lien clause pleaded in paragraph 4 above and/or the implied term pleaded in paragraph 5(2) above, the Respondents with the connivance of Viking intend to discharge the Cargo without regard to the Claimants' said rights of lien so as to defeat and/or frustrate the Claimants' lien.

11. Further the Claimants claim compound interest on the amounts found to be due to them pursuant to section 49 Arbitration Act 1996, to be assessed.

AND the Claimants claim:

(1) Freight in the sum of US$1,398,099.40 and/or damages in like amount;

(2) Damages for breach of contract;

(3) An injunction restraining the Respondents, from directly or indirectly or whether by themselves, their servants, agents, Viking or otherwise howsoever, from in anyway acting or omitting to act so as to frustrate

or defeat the Claimants' lien over the Cargo in particular by discharging from the Vessel at Ravenna or there delivering the same to any receivers or by causing or procuring its discharge from the Vessel at Ravenna or there delivering the same to any receivers unless and until the above freight and any other sums due from the Respondents to the Claimants has been duly paid.

(4)  Interest on the amounts found to be due to them, pursuant to section 49 Arbitration Act 1996, at such rate(s) and for such period(s) and compounded with such rests as the Tribunal thinks fit;

(5)  Costs.

Served this 27th day of September 2007 by Fishers, solicitors for the Claimants.

<u>IN THE MATTER OF THE ARBITRATION ACT 1996</u>
<u>AND</u>
<u>IN THE MATTER OF AN ARBITRATION</u>
B E T W E E N:-

**CALDER SEACARRIER CORP.**
<u>Claimants/Charterers</u>

**and**

**VIKING MARINE SA**
<u>Respondents/Owners</u>

**MV "VERA" C/P DD 06.06.07**

<u>CLAIM SUBMISSIONS</u>

[*References in bold in brackets herein are to pages in the bundle of supporting documents served herewith*]

1. By a voyage charter ("the Charter") made and/or evidenced by a recap email ("the Recap" (**1-8**)) from brokers to the Claimants ("Charterers"), the Respondents ("Owners") agreed to let their vessel the "VERA" ("the Vessel") to Charterers for the carriage of up to a full and complete cargo of lawful generals/foodstuff/minerals/steel from 1/3 safe ports in Charterers option in the China/Singapore range to 1/3 safe ports in Charterers' option in the Mediterranean range for the lump sum freight of US$2,622,500 FIOST and on the other terms and conditions therein set out and/or thereby incorporated.

2. The Recap expressly provided and/or there were accordingly express terms of the Charter that:

    (1) "...CHRS HV THE RIGHT TO CALL UNDER THIS C/P TO A TTL OF

1

       7 PORTS, SPLITTED IN CHRS OPTION..." **(4)**

   (2)  "UP TO FULL AND COMPLETE CGO... OWS GUARANTEE 37.000 MTONS DWCC..." **(4)**

   (3)  "FRT PAYABLE... AT EACH PORT PROPORTIONALLY FOR THE QTY LOADED AT THAT PORT." **(4)**

   (4)  "OWISE AS PER CHRS CP PROFORMA MV ABEER S WITH LOGICAL AMMENDMENTS A/O ALTERATIONS AS PER MAIN TERMS" **(5)**

3. Further as incorporated into the Charter by the Recap, Charterers' pro forma "MV ABEER S" charterparty (which was on an amended Gencon 1994 form **(9-19)**) provided inter alia, and there were accordingly express terms of the Charter that:

   (1)  "[By clause 5 **(10)**] The cargo shall be brought into the holds, loaded, stowed and/or trimmed, tallied, lashed and/or secured and taken from the holds and discharged by the Charterers";

   (2)  "[By clause 14 **(11)**)] Agency ~~In every case the Owners shall appoint their own Agent both at the port of loading and the port of discharging~~";

   (3)  "[By additional clause 25 **(13)**)] **BILLS OF LADING** ...[A]t charterers option, Master to authorize in writing the charterers agents to sign on his behalf the Bills of Lading."

4. Further, there were implied terms of the Charter (such implication to be made to give business efficacy thereto and/or as an obvious inference from the circumstances and/or by law) that:

   (1)  where Charterers had entered into firm bookings and/or contracts of affreightment for the carriage by the Vessel of cargoes within the terms of the Charter Owners would not seek

2

in any way to induce, procure or cause the shippers thereunder to breach their contracts with Charterers and/or otherwise to interfere with the performance by the shippers of the same;

(2) Owners would not attempt to suborn Charterers' agents and in particular would not seek to induce them to act or agree to act in a way that might be contrary to Charterers lawful instructions or would place them in an actual or potential conflict of interest with Charterers;

(3) Owners would co-operate with Charterers and/or their appointed agents in and about the performance of the Charter and in particular would allow them access to the Vessel for the purposes of the express term set out in paragraph 3(1) above;

5. As they were entitled to do, and/or as contemplated by the terms of the Charter, Charterers entered into the following firm bookings and/or contracts of affreightment in respect of the Vessel, namely:

(1) a contract made and/or evidenced by a recap dated 7th June 2007 (**20-22**), whereby Charterers agreed with Sinoriches to furnish the Vessel for the carriage of 20,000-21,000 mts steel products (at the latter's option) from Changshu to Ravenna ("the Changshu cargo") for the freight and on the other terms

and conditions therein set out and incorporated including the Gencon 1994 (**21**) form which provides:

**"8. Lien Clause**
The Owners [ie Charterers herein] shall have a lien on the cargo and on all sub-freights payable in respect of the cargo, for freight, deadfreight, demurrage, claims for damages and for all other amounts due under this Charter Party including costs of recovering the same"

(2) a contract made and/or evidenced by recap email and a charterparty on an amended Gencon 1994 form, both dated 13th June 2007 (**27-37**), whereby Charterers agreed with Farmbridge Ltd to furnish the Vessel for the carriage of 6,000 mts +/- 3% of steel pipes in bundles from Dalian to Ravenna ("the Dalian Cargo") for the freight of US$ 90 pmt (less a total of 3.75% commissions) and on the other terms and conditions there set out and incorporated;

(3) a contract made and/or evidenced by a recap dated 21st June 2007 (**38-42**), whereby Charterers agreed with Sinoriches Dalian to furnish the Vessel for the carriage of 5,000 cbm of machinery and equipment from Lianyungang for Skikda ("the Lianyungang Cargo") for the freight and on the terms and conditions there set out and incorporated;

(4) a contract made and/or evidenced by a recap dated 4th July 2007(**43-48**), whereby Charterers agreed with MS Steel

4

International to furnish the Vessel for the carriage of 7,800 mts 5% more at the latter's option wire rods from Jingtang to Aqaba ("the Jingtang Cargo") for the freight and on the other terms and conditions there set out and incorporated.

6. Pursuant to the Charter, Charterers ordered the Vessel to proceed to Changshu and there load the Changshu cargo and in accordance therewith the Vessel proceeded to Changshu and there loaded 21,4372.244 of steel products. Further to pursuant to the term of the Charter pleaded in paragraph 3(3) above, at Charterers' option the Master gave Penavico written authorization to sign on his behalf the bills of lading relating thereto (**48**).

7. Wrongfully and in breach of the implied term set out in paragraph 4(1) above, from about 29th June 2007 Owners, in particular by emails from their agents Priamos Maritime SA ("Priamos"), sought to suborn Charterers' appointed agents at Changshu, Penavico Changshu Agency, into agreeing to act contrary to Charterers' lawful instructions and/or on behalf of Owners and/or to accept obligations towards Owners that might cause an actual or potential conflict with their obligations towards Charterers (**55-60**).

8. Pursuant to the Charter Charterers ordered the Vessel to proceed to Dalian and there load the Dalian cargo. The Vessel proceeded to Dalian

and started to load the Dalian cargo having by 3rd July 2007 loaded about 1330 mts thereof. However, Owners by the Master and/or Priamos, inter alia:

(1) on 3rd July 2007 wrongfully and in breach of the implied term set out in paragraph 4(1) above sought by email to suborn Charterers' appointed agents at Dalian, Sinoagents, into agreeing to act contrary to Charterers' lawful instructions and/or on behalf of Owners and/or to accept obligations towards Owners that might cause an actual or potential conflict with their obligations towards Charterers (**63, 68-71,73,76**);

(2) on 3rd July 2007 (when Sinoagents refused to be suborned) in breach of the implied term set out in paragraph 4(2) above excluded them from the Vessel and/or disallowed them any access to the same (**69, 76-79,81**);

(3) on and from about 3rd/4th July 2007, in repudiatory breach and/or repudiation and/or renunciation of the Charter: ceased loading the Dalian Cargo and/or threatened to discharge that part thereof that had been loaded and/or to sail to Ravenna to discharge the Changshu Cargo upon payment of the entire lumpsum freight and/or removed the Vessel from the effective disposition of Charterers (**86-89,91-94,96-114**);

6

(4) on 4th July 2007, in breach of the express term set out in paragraph 2(3) above, demanded payment of the entire lumpsum freight of US$2,622,500 less 2.5% commission amounting to US$2,556,937.50 (**90**).

9. Nevertheless on 4th July 2007 and pursuant to the Charter, Charterers gave orders via brokers to the Vessel to resume and complete the loading of the Dalian Cargo; thereafter to proceed to Jingtang and there load the Jingtang Cargo for Aqaba; thereafter to proceed to Lianyungang and there load the Lianyungang Cargo for Skikda and thereafter to carry the loaded cargoes to the discharge ports for discharge in geographical rotation namely: Aqaba, Ravenna, Skikda (**104-5**).

10. However on 6th July 2007, Owners failed and/or refused to comply with Charterers' said orders (**111**) knowing of the existence a contract of affreightment between Charterers and Farmbridge Limited pleaded in paragraph 5(2) above and of substantially all of its terms and intending that Farmbridge Ltd should not comply with and so breach that contract (in particular the provision therein for freight to be paid to Charterers at the rate of US$90 pmt less a total of 3.75% commission), wrongfully and in repudiatory breach of the Charter Owners procured and/or induced Farmbridge Ltd (**122-127, 130**) to breach its contract

7

with Charterers by entering into a wholly incompatible and/or inconsistent contract with Owners instead of Charterers on substantially identical terms except at a freight rate of US$86 pmt less a total of 2.5% commission (**133-139**) (had they performed the Charter, Owners' remuneration in respect of all cargo shipped under the Charter would have been at approximately the effective rate US$ 2,622,500/37,000 mts = US$70.88 pmt less 2.5% commission). Thereafter the Owners completed the loading of the Dalian Cargo with their own appointed agents, pursuant to their new arrangements with Farmbridge Ltd and not pursuant to the Charter (**115-6, 132, 142**).

11. Further, wrongfully and in breach of the implied term set out in paragraph 4(3) above, on about 11th July 2007 Owners communicated with and/or made approaches to, and/or otherwise sought to interfere with MS Steel so as to cause them to cancel their contract with Charterers set out in paragraph 5(3) above (**155**). Charterers reserve the right to add to, vary or amend this paragraph after disclosure and/or the administration of interrogatories and/or Requests for Further Information herein.

12. Further by emails and/or fax messages sent between about 11th July 2007 and 19th July 2007 via brokers and/or their solicitors herein, Hill Dickinson International, Owners in various ways and in various terms threatened not to and/or indicated their intentions not to act in

accordance with Charter and repeatedly evinced their intention not to be bound thereby and thereby repudiated and/or renounced the same **(172-3, 175-185, 192)**.

13. Further, on about 18th and/or 19th July 2007, in further repudiatory breach and/or repudiation and/or renunciation of the Charter Owners deviated from the Charter and/or removed the Vessel completely from its service thereunder and/or its performance of the Charter and/or from the effective disposition of Charterers thereunder by employing it so as to proceed to Xingang for a cargo of 4200 mts wire rods for Catania Italy, for their own account.

14. Further on 17th and/or 18th and/or 19th July 2007, wrongfully and in repudiatory breach of and/or repudiation and/or renunciation of the Charter, knowing of the existence of the Sinoriches contract and of its substantial terms and in particular that Sinoriches were bound to pay freight to Charterers in respect of the Changshu cargo, and intending that Sinoriches should breach that contract, by, inter alia, email messages from its agents Priamos induced Sinoriches to breach its contract with Charterers by paying the substantial part of that freight alternatively substantially all of that freight (US$1,140,378.30 + US$257,721.10 amounting to US$1,398,099.40) to Owners rather than to Charterers.

9

15. On 19th July by email from Charterers' solicitors Fishers to Owners Solicitors Hill Dickinson International, Charterers, as they were entitled to do, accepted the above repudiatory breaches and/or repudiation and/or renunciation of the Charter thereby terminating the same (**210-213**).

16. Further at all material times from before about 18th July and as they were entitled to do, Charterers exercised and/or asserted their rights of lien over the Changshu cargo pursuant to the term of the Sinoriches contract pleaded in paragraph 5(1) above by, inter alia, retaining through their agents Penavico, possession and/or control of the bills of lading relating thereto that had been duly signed by Penavico on behalf of the Master pursuant to the authority set out in paragraph 6 above (**196, 198, 208, 217-218**).

17. Further on and/or from about 25th July 2007 knowing of the existence of the Sinoriches contract and its substantial terms including Charterers' contractual lien over the Changshu Cargo, Owners wrongfully sought to induce Sinoriches to breach its contract with Charterers by acting in concert with Owners in and about the issue of purported bills of lading in respect thereof which were not issued pursuant to the Charter, to be issued to third parties in order to defeat Charterers' contractual lien over the Changshu cargo. Charterers reserve the right to add to, vary or amend this paragraph after

10

disclosure and/or the administration of interrogatories and/or Requests for Further Information herein.

18. By reason of the matters aforesaid the Charterers have suffered loss and damage and been put to expense.

### PARTICULARS

A. Loss of profits of the Charter     US$362,638.03
   (See schedule (**229-230**))

B. Anticipated claims from shippers   US$200,000

C. Further in respect of any damages awarded to the Owners herein in tort Charterers will seek an additional award of aggravated and/or exemplary ges on the grounds, inter alia, that:

(1) these torts were committed by Owners in the course of a particularly aggravating and/or vexatious and/or cynical course of conduct. Charterers will rely on the facts and matters above pleaded and Owners' communications therein referred to and will rely upon, in particular: (a) Owner's readiness to breach or threaten to breach the Charter to seek to force Charterers to comply with their demands were not met; and (b) their repeated yet groundless accusations and suggestions to Charterers and others that Charterers had somehow acted in bad faith/criminally/fraudulently **(93-94,95-97,107-108, 121-123, 132,142,145-146)**; and/or

11

(2)　these torts were committed by Owners on the basis of a an assessment or calculation that the profits they would make as a result thereof would exceed any damages and/or other compensation they would have to pay Charterers as a result thereof and/or that they would be able to manipulate the circumstances so that they would in fact not have to pay Charterers any damages in relation thereto.

In their recovery herein, Charterers will give credit if, insofar as and where appropriate for the sum of US$131,261.13 received by way of freight under the contract with Sinoriches.

19.　Charterers expressly reserve their rights to waive Owners' said torts and to elect to claim the proceeds thereof (including but not limited freight received from Farmbridge Ltd and/or Sinoriches) as money had and received to their use.

20.　Further Charterers claim compound interest on the amount found to be due to them

AND Charterers claim against Owners:

(1)　Damages for breach of charter and for tort;

(2)   Aggravated and/or exemplary damages for tort;

(3)   Alternatively to the said damages for tort an account of all proceeds received by Owners as a result of the commission of the said torts (including but not limited to freight received from Farmbridge and/or Sinoriches) and an order that Owners do pay Charterers all sums due and owing on the said account as money had and received to Charterers' use;

(4)   Interest on the amounts found to be due to them, pursuant to section 49 Arbitration Act 1996, at such rate(s) and for such period(s) and compounded with such rests as the Tribunal thinks fit;

(5)   Costs

Served this 1st day of August 2007 by Fishers, solicitors for Charterers.