UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------X
CALDER SEACARRIER CORP.,

                Plaintiff,                07 CV 6520 (LAK)

   - against –

VIKING MARINE S.A. and SINORICHES GLOBAL
LTD. a/k/a SGL SHIPPING LIMITED,

                Defendants.
------------------------------------------------------------X

This is the paginated bundle, exhibit "KS 3" referred to in the declaration of KISHORE SHARMA herein dated 4th January 2008

Signed _____
     KISHORE SHARMA

At 72 Leonard Street, London, EC2A 4QX, United Kingdom, this 4th day of January 2008

Case 2:07-cv-06520-LAK    Document 42    Filed 01/07/2008    Page 2 of 10

9] Vol. 1

Aust. Ct.

980) 2
m made
s against
ce upon
gous to
Rogers
s Benz
(unre-

n, sub-
ecided,
ason of
t it les-
se then
point,
which
tion in

for the
sum of
ants to

both
hich I
of this

## HOUSE OF LORDS

Nov. 8, 9, 10, 14, 15 and 16, 1988

COLONIAL BANK (NOW BANK OF
BOSTON CONNECTICUT)
v.
EUROPEAN GRAIN & SHIPPING LTD.

(THE "DOMINIQUE")

Before Lord KEITH OF KINKEL, Lord BRANDON
OF OAKBROOK,
Lord OLIVER OF AYLMERTON, Lord GOFF OF
CHIEVELEY and
Lord JAUNCEY OF TULLICHETTLE

Charter-party (Voyage) — Freight — Non-payment — Bank gave notice of assignment to charterers — Vessel arrested by creditor — Owners unable or unwilling to continue voyage — Charterers incurred transhipment costs — Whether bank entitled to claim freight from charterers — Whether charterers entitled to right of set off.

By an assignment under seal dated Apr. 14, 1982, the owners of the vessel Dominique assigned all the earnings of that vessel to the claimant bank. On June 16, 1982, the vessel was let to the charterers for a voyage from Kakinada to northern European ports carrying a cargo of agricultural products in bulk. The charter was in the Gencon form and provided inter alia:

    8. Owners shall have a lien on the cargo for freight . . . Charterers shall also remain responsible for freight.

    9. The Captain to sign Bills of Lading at such rate of freight as presented without prejudice to this charter-party . . .

    16. Freight shall be prepaid within five days of signing and surrender of final Bills of Lading, full freight deemed to be earned on signing Bills of Lading, discountless and non-returnable; vessel and or cargo lost or not lost . . .

Between June 28 and July 14, 1982, the vessel loaded a full cargo at Kakinada. Bills of lading were signed before the vessel left. She then set sail for Northern Europe via Colombo for bunkers.

At about this time the claimants learned that the owners' club cover was about to be cancelled and either on or shortly after July 14, 1982, the claimants gave notice in writing of the assignment to the respondent charterers.

On July 19 the vessel arrived at Colombo and was almost immediately arrested by a creditor who had on an earlier occasion supplied bunkers to the vessel. The owners indicated by their conduct that they were either unwilling or unable to continue the voyage, and the vessel remained under arrest.

On July 22 by a telex communication to the owners the respondents accepted the owners' conduct as terminating the charter-party.

In August while the vessel was still under arrest the respondents discharged the cargo and arranged for it to be carried in another ship to its destination. The respondents thus incurred considerable expenses.

On or about July 26 the bills of lading were surrendered to the shippers of the cargo.

The respondents never paid the charter-party freight of $223,767, and the claimants claimed it from the respondents.

The dispute was referred to arbitration. The respondents contended that since they had lawfully terminated the charter-party before freight became due under cl. 16 they were never under any liability to pay the freight whether to the owners or to the claimant. They further argued that if they did become liable they were entitled to set off against that liability the amount of damages they had suffered and these were sufficient to extinguish the liability for the freight.

The arbitrators held that the respondents had a right of set off and made their award in favour of the respondents.

The claimants appealed with leave from that award.

————*Held*, by Q.B. (Com. Ct.) (HOBHOUSE, J.), that (1) the liability for freight was correctly described by the arbitrators as "debitum in praesenti, solvendum in futuro" i.e. there was a liability for freight as an existing debt owed by the charterer to the shipowner but the time at which that debt or liability must be discharged was postponed; the debt existed from the moment the bills of lading were signed, i.e. not later than July 14 but the time that the debt had to be discharged did not arrive until a time after July 22 and probably as late as July 29; from July 14 the freight was solely at the risk of the charterers and it was for them to insure their interest if they chose to do so;

(2) the liability for freight having accrued as a debt by July 22, although not on that date already payable, was not terminated or discharged when the respondents accepted the owners' conduct as being a repudiation of the charter;

(3) the law as to set off was well settled and it applied both to ordinary freight and advance freight; once the right to advance freight had accrued it received the same treatment as ordinary freight and no defence of equitable set off on the ground of a cross-claim could be admitted; as between the owners and the respondents the respondents were not entitled to set up any set off;

(4) a debtor was entitled to rely upon all defences which would be valid defences if raised against the assignor in respect of the assigned right; any cross-claim raised must be one which qualified as a defence and the criteria were those which identified what cross-claims amounted to a defence; they did not involve any distinction favourable to the debtor between the position of an assignor and assignee;

(5) there was no equity upon which the respondents could rely against the owners; the owners had

a contractual right to be paid freight without deduction and for a tribunal to formulate a judgment or award which in effect contradicted that right would be indefensible; the claimants were legal assignees; they acquired the legal debt which had accrued and they gave written notice of the assignment to the respondents; the events upon which the respondents sought to rely were matters subsequent to the date of notice; to deprive the claimants of their assigned rights on the grounds of something that happened subsequently was both contrary to principle and to the law; therefore for the respondents to seek to invoke the possibility as against the claimants of having recourse to some procedural obstruction of the enforcement of the claimants' legal rights was insupportable; the arbitrator's award would be set aside.

On appeal by the charterers:

————Held, by C.A. (Fox, Croom-Johnson and Mustill, L.JJ.), that (1) the freight clause clearly conveyed an intention to give the owners an indefeasible right to freight from the moment when the bills of lading were signed, a right which was not destroyed whatever happened thereafter even though the right would not have been converted into an enforceable claim for money until five days had elapsed from the surrender of the bill; the owners had and their assignees still had an entitlement to freight which survived the repudiation of the contract, and which became enforceable within five days of July 26, 1982, the time by which at the latest the bill of lading was surrendered;

(2) if the bills were surrendered before July 16 then the freight would have fallen due for payment before the contract came to an end; the owners already had a cause of action for the freight and nothing which happened thereafter could have taken it away; if the bills had not been surrendered by July 22 and if the act of surrender was not something which lay within the owners' powers the right to freight disappeared with the remainder of the contractual obligations for the accrual of the cause of action was in the fullest sense contingent;

(3) the owners were obliged to go on performing the voyage in the future and the charterers were obliged to pay the freight in the future; if the acceptance of the repudiation brought about a discharge of the parties' unperformed obligations there was no ground for distinguishing between the respective obligations of the two parties; the owners' right to freight fell away with the charterers' right to require performance of the voyage unless the five days had already expired;

(4) although it was established beyond any doubt that cargo shortage or damages was not a ground for deduction of freight and although it might well be that damages for other types of breach by the shipowner in circumstances where the contract had been substantially performed should by parity of reasoning also be the subject of a cross-claim or counterclaim alone, there was nothing in the authorities which excluded a right of set-off in a case such as the present if the conditions for such a right were otherwise satisfied;

(5) there was nothing in the reported cases which would prevent the Court from giving effect to any right of set-off which might otherwise be appropriate simply because the claim was for voyage freight;

(6) before the Judicature Acts the Courts of equity would have regarded the owners' claim for freight as having such a close link with the charterers' claim for total failure to perform the contract that the one could not properly be enforced without the other being taken into account; and it would not have been fair, had the owners been suing for their own account to allow them to recover the freight in full without regard to the damage caused by their own wrongful repudiation; the appeal would be allowed.

The claimant bank appealed the questions for decision being (1) had the owners' right to advance freight accrued before the charter was terminated by the charterers' acceptance of the owners' repudiation of it? (2) If such right had so accrued did it survive such termination? (3) If so would the charterers, had the owners not assigned their right to freight to the bank, have been entitled to set off against such right the damage suffered by the charterers as a result of the owners' repudiation of the charter ? (4) If not were the charterers nevertheless entitled to such set-off as against the bank claiming as assignees?

————Held, by H.L. (Lord Keith of Kinkel, Lord Brandon of Oakbrook, Lord Oliver of Aylmerton, Lord Goff of Chieveley and Lord Jauncey of Tullichettle) that (1) while the arbitrators were unable to fix the date with certainty they were satisfied that it was later than July 22 and the bank had failed to obtain a finding that the surrender of the bills of lading was completed before the termination of the charter on July 22; the effect of the phrases "freight shall be prepaid within five days of signing and surrender of final bills of lading" and "full freight deemed to be earned on signing bills of lading", was that the owners' right to freight accrued on completion of the signing of all the bills of lading but payment was postponed until five days after the bills of lading, having been signed, were delivered to the owners; the owners right to freight accrued on July 14, 1982, before the termination of the charter (see p. 435, cols. 1 and 2);

(2) the postponement of payment was an incident attaching to the right acquired but it was not a condition of its acquisition; the owners' right to freight having been unconditionally acquired before the termination of the charter was not divested or discharged by the termination; such right to freight survived the termination of the charter (see p. 435, col. 2);

(3) when an owner's breach of a charter-party was of a non-repudiatory character, such as partial loss of or damage to cargo, it did not give rise to an equity in favour of the charterers sufficient to override the established rule that a cargo-owner was not entitled to set up as a defence to a claim for freight, damage suffered by him by reason of some breach of contract by the owner in relation to the contract

of carriage; and a repudiatory breach was no more capable of giving rise to a defence of equitable set-off than was a non-repudiatory breach (see p. 440, col. 2; p. 441, col. 1);

———The Aries, [1977] 1 Lloyd's Rep. 334, considered.

(4) if the owners had not assigned their right to freight to the bank the charterers would not have been entitled to set off against such right the damage suffered by them as a result of the owners' repudiation of the charter-party (see p. 442, col. 2);

(5) the charterers were no more entitled to rely on their counterclaim for damages as a defence by way of equitable set-off against the bank than they would have been entitled to rely on it, but for the assignment, against the owners; the appeal would be allowed (see p. 433, col. 2; p. 443, col. 2);

——— Government of Newfoundland v. Newfoundland Railway Co., (1888) 13 App. Cas. 199, considered.

---

The following cases were referred to in the judgment of Lord Brandon:

Allison v. Bristol Marine Insurance Co. Ltd., (H.L.) (1876) 1 App. Cas. 209;

Aries Tanker Corporation v. Total Transport Ltd. (The Aries), (H.L.) [1977] 1 Lloyd's Rep. 334; [1977] 1 W.L.R. 185; (C.A.) [1976] 2 Lloyd's Rep. 256;

A/S Gunnstein & Co. v. Jensen Krebs and Nielsen (The Alfa Nord), (C.A.) [1977] 2 Lloyd's Rep. 434;

Beasley v. D'Arcy, (H.L.) (1804) 2 Sch. & Lef. 403;

Cleobulos Shipping Co. v. Intertanker Ltd. (The Cleon), (C.A.) [1983] 1 Lloyd's Rep. 586;

Elena Shipping Ltd. v. Aidenfield Ltd. (The Elena), [1986] 1 Lloyd's Rep. 425;

Fibrosa Spolka Akcyjna v. Fairbairn Lawson Combe Barbour Ltd., (H.L.) (1942) 73 Ll.L. Rep. 45; [1943] A.C. 32;

Great Indian Peninsular Railway Co. v. Turnbull, (1885) 53 L.T. 325;

Hanak v. Green, (C.A.) [1958] 2 Q.B. 9;

Henriksens Rederi A/S v. T.H.Z. Rolimpex (The Brede), (C.A.) [1973] 2 Lloyd's Rep. 333; [1974] Q.B. 233;

Johnson v. Agnew, (H.L.) [1980] A.C. 367;

McDonald v. Dennys Lascelles Ltd., (1933) 48 C.L.R. 457;

Newfoundland (Government of) v. Newfoundland Railway Co., (P.C.) (1888) 13 App. Cas. 199;

Piggott v. Williams, (1821) 6 Madd. 95;

Rawson v. Samuel, (1839) 1 Cr. & Ph. 161;

Smith v. Parkes, (1852) 16 Beav. 115;

Stumore v. Campbell & Co., (C.A.) [1892] 1 Q.B. 314;

Vagres Compania Maritima S.A. v. Nissho-Iwai American Corporation, (C.A.) [1988] 2 Lloyd's Rep. 330.

---

This was an appeal by the claimant bank, Bank of Boston Connecticut (formerly Colonial Bank) from the decision of the Court of Appeal ([1988] 1 Lloyd's Rep. 215) allowing the appeal of the charterers European Grain & Shipping Ltd. from the decision of Mr. Justice Hobhouse ([1987] 1 Lloyd's Rep. 239) given in favour of the bank, and holding inter alia that the charterers were liable to pay to the bank the balance of freight and that the charterers were not entitled to set off their extra costs against the freight.

Mr. Bernard Eder and Mr. Steven Berry (instructed by Holman Fenwick & Willan) for the bank; Mr. Martin Moore-Bick, Q.C. and Mr. Timothy Young (instructed by Messrs. Richards Butler) for the charterers.

The further facts are stated in the judgment of Lord Brandon of Oakbrook.

Judgment was reserved.

Thursday Feb. 2, 1989

---

## JUDGMENT

**Lord KEITH OF KINKEL:** My Lords, I have had the opportunity of considering in draft the speech to be delivered by my noble and learned friend Lord Brandon of Oakbrook. I agree with it, and for the reasons he gives would allow the appeal.

**Lord BRANDON OF OAKBROOK:** My Lords, the subject matter of this appeal is a claim by the appellants ("the bank") as assignees of the owners of the m.v. Dominique ("the owners") to recover from the respondents ("the charterers") advance freight which the bank alleges became payable by the charterers under a voyage charter-party relating to that vessel made between the owners and the charterers in June, 1982. The charterers dispute that any such freight became payable, but it is agreed between the parties that, if it did, the amount of it was U.S.$223,676.

The bank's claim was referred to arbitration by three arbitrators in London, who by a reasoned award made on Feb. 12, 1986 decided

in favour of the charterers and dismissed the claim. The bank appealed with leave to Mr. Justice Hobhouse in the Commercial Court [1987] 1 Lloyd's Rep. 239, who by an order dated Oct. 24, 1986 allowed the appeal and awarded to the bank the full amount of their claim. The charterers appealed to the Court of Appeal (Fox, Croom-Johnson and Mustill L.JJ.) [1988] 1 Lloyd's Rep. 215; [1988] 3 W.L.R. 60, which by an order dated Dec. 21, 1987, as amended on Jan. 14 and Apr. 11, 1988, allowed the appeal, set aside the order of Mr. Justice Hobhouse and restored the arbitrators' award. The bank now brings a further appeal from the decision of the Court of Appeal with the leave of your Lordships' House.

The facts found by the arbitrators are as follows. By an assignment under seal dated Apr. 14, 1982 the owners assigned absolutely to the bank all the earnings of *Dominique* including all freight. By a charter-party dated June 16, 1982 the owners chartered *Dominique* to the charterers to proceed to Kakinada, in India, and there load a cargo of agricultural products in bulk for carriage to European ports. Under that charter-party *Dominique* loaded at Kakinada between June 28 and July 13, 1982 various parcels of cargo, in respect of which bills of lading were signed between those dates and on July 14, 1982. On that date *Dominique* left Kakinada bound for Colombo for bunkers. At about the same time the bank received notice that the vessel's club entry would be cancelled with effect from June 28, 1982, and they accordingly gave to the charterers written notice of the assignment referred to earlier. On July 19, 1982 *Dominique* arrived at Colombo and was arrested by previous suppliers of bunkers to her. *Dominique* remained under arrest and it became apparent to both the charterers and the bank that the owners had no funds of their own with which to procure her release and that the club would not assist them. By a telex from the charterers to the owners dated July 22, 1982 the charterers justifiably elected to treat the owners' conduct as a repudiation of the charter-party. By July 26, 1982 all the bills of lading previously signed had been surrendered, which I take to mean delivered, to the shippers. On Aug. 12, 1982 the charterers obtained the leave of the Court in Colombo to discharge the cargo from *Dominique*. During September, 1982 the cargo, following such discharge, was transhipped to another vessel. That vessel then on-carried the cargo to European ports where it was discharged during November, 1982. *Dominique* was later sold by order of the Court in Colombo.

The cost to the charterers of discharging and transhipping the cargo at Colombo, and having it on-carried to European ports and discharged there, exceeded the amount of the advance freight claimed from them by the bank.

The charter-party was on the Gencon form with typed alterations, a series of additional typed clauses and an addendum, and was governed by English law. The essential provision relating to the payment of advance freight was cl. 16 of the additional typed clauses, which was in these terms:

> 16. Freight shall be prepaid within five days of signing and surrender of final bills of lading, full freight deemed to be earned on signing bills of lading, discountless and non-returnable, vessel and/or cargo lost or not lost and to be paid to [a named bank in the Piraeus].

The charterers disputed their liability to pay the advance freight claimed by the bank on two grounds. The first ground was that the charterers, by accepting the owners' repudiation of the charter-party, had lawfully brought the charter-party to an end before the owners' right to be paid freight under cl. 16 had accrued. The second ground was that, if, contrary to the first ground, the owners' right to be paid freight under cl. 16 had accrued before the charter-party was brought to an end, the charterers were entitled to set off against the bank's claim to freight the damage suffered by them as a result of the owners' repudiation.

Mr. Justice Hobhouse considered, rightly in my view, that the grounds for disputing liability relied on by the charterers raised four questions for decision. Using my own words, I would formulate those four questions as follows: (1) Had the owners' right to advance freight accrued before the charter-party was terminated by the charterers' acceptance of the owners' repudiation of it? (2) If such right had so accrued, did it survive such termination? (3) If so, would the charterers, had the owners not assigned their right to freight to the bank, have been entitled to set off against such right the damage suffered by the charterers as a result of the owners' repudiation of the charter-party? (4) If not, are the charterers nevertheless entitled to such set-off as against the bank claiming as assignees?

*Question (1): Accrual of owners' right to advance freight*

The answer to this question depends on two matters. The first matter is the sequence of the

relevant events as found by the arbitrators. The second matter is the true construction of cl. 16 of the charter-party.

So far as the first matter is concerned the arbitrators found the sequence of the relevant events to have been as follows: (i) on July 14, 1982 the signing of the bills of lading was completed; (ii) on July 22, 1982 the charter-party was terminated by the charterers' acceptance of the owners' repudiation of it; and (iii) by July 26 all the bills of lading had been surrendered to the shippers. The expression "by 26 July", used by the arbitrators in relation to event (iii) above, is in a sense equivocal, in that, on a literal interpretation, it might refer to any date not later than July 26, including a date earlier than July 22. The inference which I would draw, however, is that, while the arbitrators were unable to fix the date with certainty, they were satisfied that it was later than July 22. In any case, in so far as it would be to the advantage of the bank to have had a finding that the surrender of the bills of lading was completed before the termination of the charter-party on July 22, they failed to obtain such finding.

So far as the second matter is concerned, it was recognized by both Courts below that cl. 16 of the charter-party is confusingly drawn and because of that difficult to interpret. The main difficulty arises from the apparent conflict between the first phrase of the clause, which reads "freight shall be prepaid within five days of signing and surrender of final bills of lading", and the second phrase, which reads "full freight deemed to be earned on signing bills of lading". For the bank it was contended that the effect of the two phrases taken together was that the owners' right to the freight accrued on completion of the signing of all the bills of lading, but payment was postponed until five days after the bills of lading, having been signed, were delivered to the shippers. On this basis the owners' right to freight accrued on July 14, 1982, well before the termination of the charter-party on July 22. For the charterers it was contended that their obligation to pay the freight and the corresponding right of the owners to be paid the freight were both governed, and governed only, by the first phrase. On that basis the owners' right to be paid the freight accrued after July 22, 1982.

While the matter is far from easy, I consider that the contention for the bank is to be preferred to that for the charterers. The reason why I take that view is that the contention for the charterers gives no effect to the second phrase of cl. 16 "full freight deemed to be earned on signing bills of lading", whereas the contention for the bank does. This conclusion accords with the decision of the Court of Appeal on a different but comparable clause in a charter-party in *Vagres Compania Maritima S.A. v. Nissho-Iwai American Corporation*, [1988] 2 Lloyd's Rep. 330.

I would therefore answer question (1) by saying that the owners' right to freight accrued before the termination of the charter-party.

*Question (2): Effect of charter-party being terminated*

The principles of law applicable when a contract is terminated by the acceptance by one party to it of a repudiation by the other party to it are not in doubt. They were clearly and simply stated by Mr. Justice Dixon in *McDonald v. Dennys Lascelles Ltd.*, (1933) 48 C.L.R. 457 at pp. 476–477, where he said:

> When a party to a simple contract, upon a breach by the other contracting party of a condition of the contract, elects to treat the contract as no longer binding upon him, the contract is not rescinded as from the beginning. Both parties are discharged from further performance of the contract, but rights are not divested or discharged which have already been unconditionally acquired. Rights and obligations which arise from the partial execution of the contract and causes of action which have accrued from its breach alike continue unaffected.

That statement of the relevant principles was expressly approved and adopted by Lord Wilberforce in *Johnson v. Agnew*, [1980] A.C. 367 at p. 396. Applying those principles to the facts of the present case it is necessary to consider whether the owners' right to the freight had been "unconditionally acquired" by them before the termination of the charter-party. The circumstance that, by reason of the first phrase of cl. 16, the charterers' obligation to pay the freight was postponed until after the termination of the charter-party does not, in my view, mean that the owners' prior acquisition of the right to the freight was conditional only. The postponement of payment was an incident attaching to the right acquired, but it was not a condition of its acquisition. It follows that, in accordance with the principles of law referred to above, the owners' right to the freight, having been unconditionally acquired before the termination of the charter-party, was not divested or discharged by such termination.

I would therefore answer question (2) by saying that the owners' right to the freight survived the termination of the charter-party.

*Question (3): Set-off as between charterers and owners*

Under a contract for the carriage of goods by sea, such as the voyage charter-party in the present case, freight is the monetary consideration payable by the cargo-owner to the shipowner for the carriage of the goods. The time when the freight is payable depends upon the terms of the contract. It may be payable on delivery of the goods at the port of discharge, in which case it is called "freight" without any qualifying epithet; or it may be payable at an early stage of the voyage, such as on completion of the signing of bills of lading, in which case it is called "advance freight"; or part of it may be payable at an early stage of the voyage and the balance on delivery.

It is a long established rule of English law, dating at least from the early part of the 19th century, that a cargo-owner is not entitled to set up, as a defence to a claim for freight, damage suffered by him by reason of some breach of contract by the shipowner in relation to the carriage, causing for instance partial loss of or damage to the goods, but must enforce any right which he has in respect of such breach by a cross-claim. The effect of the rule before the coming into force of the Supreme Court of Judicature Acts, 1873–1875 was that a cargo-owner sued by a shipowner for freight could only recover his damage by bringing a separate cross-action against the shipowner; the effect of the rule since the coming into force of those Acts has been that the cargo-owner, instead of having to bring a separate cross-action, has been able (though not bound) to raise his cross-claim by way of counterclaim in the shipowner's action. The rule applies equally to freight payable on delivery of the goods and to advance freight payable at some earlier stage of the voyage.

The rule of law referred to differs from that prevailing in many other countries and has been subjected to a considerable amount of criticism in various quarters from time to time. The continued existence of the rule was, however, affirmed by the Court of Appeal in *Henriksens Rederi A/S v. T.H.Z. Rolimpex (The Brede)*, [1973] 2 Lloyd's Rep. 333; [1974] Q.B. 233, in which the earlier authorities were fully examined. That decision of the Court of Appeal was unanimously approved by your Lordships' House in *Aries Tanker Corporation v. Total Transport Ltd. (The Aries)*, [1977] 1 Lloyd's Rep. 334; [1977] 1 W.L.R. 185. It follows that the rule concerned (which I shall from now on call "the rule against deduction"), whatever its merits or demerits may be, is not open to challenge.

In all the cases in which the rule against deduction has been applied, up to and including *The Aries*, the breaches of contract by shipowners sought to be relied on as defences to claims for freight have been non-repudiatory breaches resulting in partial loss of or damage to cargo or delay in its delivery. So in *A/S Gunnstein & Co. K/S v. Jensen (The Alfa Nord)*, [1977] 2 Lloyd's Rep. 434, a case in which charterers claimed the right to deduct damage caused by delay from freight due to shipowners, we find Lord Justice Roskill applying the rule against deduction and saying, at p. 436:

> We have to apply the well-established principle that there is no right of set-off for claims for damages for breach of charter, whether for loss of or damage to goods or for alleged failure to prosecute a voyage with reasonable dispatch or otherwise, against a claim for freight.

The words "or otherwise" used by Lord Justice Roskill in this passage might, if taken out of context, cover a claim for damage caused by an accepted repudiation. In my view, however, Lord Justice Roskill did not have a claim of that kind in mind, but was referring to other breaches of contract of a non-repudiatory character.

Since 1977 the rule against deduction has been applied to cases of non-repudiatory breaches of kinds different to those referred to above. In *Cleobulos Shipping Co. Ltd. v. Intertanker Ltd. (The Cleon)*, [1983] 1 Lloyd's Rep. 586 the rule was applied by the Court of Appeal to a case in which the breach of contract relied on was inadequacy in the ship's cargo pumps, making it necessary for her to leave one port of discharge and proceed to another. In *Elena Shipping Ltd. v. Aidenfield Ltd. (The Elena)*, [1986] 1 Lloyd's Rep. 425 the rule was applied by Mr. Justice Steyn to a case in which the breach of contract relied on was the unfitness of some cargo spaces because of lack of facilities for ventilation.

It does not appear that, in any of the 19th century cases in which the rule against deduction was applied, equitable principles were invoked in order to defeat such rule. In *The Brede*, [1973] 2 Lloyd's Rep. 333; [1974] Q.B. 233 a defence by way of equitable set-off, based on short delivery of and damage to cargo, was put forward and rejected by the Court of Appeal. In *The Aries*, [1977] 1 Lloyd's Rep. 334; [1977] 1 W.L.R. 185 the same defence,

Case 2:07-cv-06520-LAK    Document 42    Filed 01/07/2008    Page 8 of 10

based on short delivery, was again put forward and rejected by your Lordships' House. As is apparent, however, the breaches of contract relied on in both these cases were again of a non-repudiatory character. The present case, therefore, raises for the first time the question whether, although a claim in respect of a non-repudiatory breach of a voyage charter-party cannot operate as a defence by way of set-off to a claim for freight, a claim in respect of a repudiation of such contract, accepted as such, is capable of doing so.

In the present case it was contended for the bank that, as between the owners and the charterers, the owners were entitled to rely on the rule against deduction as precluding the charterers from setting up, as a defence to any claim by the owners for advance freight, the damage suffered by them as a result of the owners' repudiation of the charter-party. For the charterers, on the other hand, it was contended that, while they could not, having regard to the decision in *The Aries*, set up their damage as a defence at common law by way of abatement or otherwise, they were entitled to set it up as a defence by way of equitable set-off. They accepted that an ordinary cross-claim in respect of loss of or damage to cargo amounting to no more than a breach of warranty, such as was relied on in *The Aries*, could not give rise to a defence by way of equitable set-off; but they contended that, where there was a much more serious breach of contract by the owners in the form of a repudiation of the charter-party accepted by them, a defence by way of equitable set-off was available to them.

Before examining this contention for the charterers it is necessary to explain briefly the nature, origins and basis of a defence by way of equitable set-off. Until the coming into force of the Supreme Court of Judicature Act, 1873 and 1875 Courts of equity had the power to prohibit by injunction the enforcement of a common law claim where there was a cross-claim which they regarded as being of an appropriate character. Section 24 of the Supreme Court of Judicature Act, 1873 took away that power and provided instead that such a cross-claim could be raised as a defence to the claim. Those provisions of the 1873 Act have since been replaced successively, without any difference in effect, first by ss. 36–41 of the Supreme Court of Judicature (Consolidation) Act 1925, and more recently by s. 49 of the Supreme Court Act, 1981. It therefore becomes necessary, in order to decide whether a party can rely on a particular cross-claim as giving him a defence by way of equitable set-off to a common law claim to-day, to see whether such cross-claim is of such a character that it would before the coming into force of the Supreme Court of Judicature Acts, 1873 and 1875 have led a Court of equity to prohibit by injunction the enforcement of such common law claim.

The authority most relied on as providing the relevant test is *Rawson v. Samuel*, (1839) 1 Cr. & Ph. 161, in which Lord Cottenham, L.C. said, at p. 179, that a cross-claim, in order to give rise to a defence by way of equitable set-off, must be such as "impeached the title to the legal demand". He then gave examples of cross-claims of that character. One case referred to was *Beasley v. D'Arcy*, (1800) 2 Sch. & Lef. 403. There a tenant was entitled to redeem his lease on payment to his landlord of rent due. The landlord had previously caused damage to the land let and the tenant was held to be entitled to deduct from the rent due the amount of the damage so done. Another case referred to was *Piggott v. Williams*, (1821) 6 Madd. 95. There a solicitor brought a claim against a client for the costs of work done. The client cross-claimed on the ground that the incurrence of the costs had been caused by the solicitor's negligence. It was held that the client was entitled to rely on such cross-claim as a defence.

The concept of a cross-claim being such as to "impeach the title to the legal demand" is not a familiar one to-day. A different version of the relevant test is to be found in the decision of the Judicial Committee of the Privy Council in *Government of Newfoundland v. Newfoundland Railway Co.*, (1888) 13 App. Cas. 199. In that case there was a contract between the Newfoundland Railway Co. ("the company") and the Government of Newfoundland ("the government") under which the company agreed to build a railway line some 340 miles in length in five years and, having done so, to maintain it and operate it continuously. In return the government agreed inter alia to pay the company an annual subsidy for 35 years, such subsidy to be paid in proportionate parts as and when each five-mile section of the line was completed and operated. The company built part of the line and, on completion of each five-mile section, was paid by the government a proportionate amount of the annual subsidy attributable to it. Subsequently the company abandoned the building of the remaining part of the line, upon which the government refused to make any further payments of subsidy. The company, together with certain assignees of its rights under the contract, brought a petition of

right against the government claiming inter alia that the government was bound to continue payment of subsidy in respect of the five-mile sections of the line which had been completed for the full period of 35 years. It was held that the government was bound by the terms of the contract to continue the payments of subsidy as claimed; but that it was entitled, as against both the company and the assignees, to set off against that liability the damage suffered by it by reason of the failure of the company to complete the whole of the line. In this connection Lord Hobhouse, who delivered the judgment of the Board, said, at pp. 212-213:

> There is no universal rule that claims arising out of the same contract may be set against one another in all circumstances. But their Lordships have no hesitation in saying that in this contract the claims for subsidy and for non-construction ought to be set against one another.

Lord Hobhouse then referred to *Smith v. Parkes*, (1852) 16 Beav. 115 at p. 119 and continued:

> That was a case of equitable set-off, and was decided in 1852, when unliquidated damages could not by law be the subject of set-off. That law was not found to be conducive to justice, and has been altered. Unliquidated damages may now be set off as between the original parties, and also against an assignee if flowing out of and inseparably connected with the dealings and transactions which also give rise to the subject of the assignment.

It is to be inferred that the change of law there referred to by Lord Hobhouse had been brought about by legislation in what was then the Colony of Newfoundland, which adopted the principles enacted in England by s. 24 of the Supreme Court of Judicature Act, 1873 to which I drew attention earlier. *Government of Newfoundland v. Newfoundland Railway Co.* was clearly a case of a defence by way of equitable set-off based on a cross-claim. It was treated as such by Lord Justice Sellers in *Hanak v. Green*, [1958] 2 Q.B. 9 at p. 31, and by Mr. Justice Hobhouse in his judgment in the present case [1987] 1 Lloyd's Rep. 239 at p. 255. It is to be observed, however, that the criterion which Lord Hobhouse applied, 13 App. Cas. 199 at p. 213, in deciding whether the government's cross-claim for unliquidated damages could be set off against the company's claim was not that the cross-claim "impeached the title to the legal demand", as in *Rawson v. Samuel*, 1 Cr. & Ph. 161, but rather that it was a cross-claim "flowing out of and inseparably connected with the dealings and transactions which also give rise" to the claim.

I turn now to examine, against the background of the origin and nature of a defence by way of equitable set-off which I have described, the manner in which your Lordships' House dealt with such a defence in *The Aries*, [1977] 1 Lloyd's Rep. 334; [1977] 1 W.L.R. 185. That case arose out of a voyage charter-party under which the entire freight was payable on delivery. Delivery having been made, the charterers did not pay to the shipowners the full amount of freight due but deducted a substantial sum from that amount on the ground of short delivery of the cargo. The owners brought an action against the charterers in the Queen's Bench Division in which they claimed payment of the balance of freight so deducted. The charterers resisted the claim on the ground that they were entitled to set off against it the amount of the damage which they had suffered by reason of the short delivery. They also counterclaimed for the amount of that loss. The owners having applied for summary judgment under R.S.C., O. 14, Mr. Justice Donaldson refused leave to defend and gave judgment in favour of the owners for the full amount of their claim. The charterers, having appealed unsuccessfully to the Court of Appeal [1976] 2 Lloyd's Rep. 256, brought a further appeal to your Lordships' House which was, as I indicated earlier, unanimously dismissed.

The primary ground on which the House dismissed the appeal was that the charter-party expressly incorporated art. III, r. 6 of the Hague Rules, which provides that any claim for loss of or damage to cargo shall be discharged unless suit is brought within one year from the date of delivery or the date on which the goods should have been delivered; that the charterers had failed to bring suit within that period of time; and that their cross-claim in respect of short delivery had therefore become prescribed, so that it could not be relied on by way of either defence or counterclaim.

While this was the primary ground on which the appeal was dismissed, the House also rejected arguments put forward for the charterers that their cross-claim in respect of short delivery afforded them a defence to the owners' claim for the balance of the freight either by way of abatement at common law or by way of equitable set-off.

Lord Wilberforce's speech begins [1977] 1 Lloyd's Rep. 334 at p. 335; [1977] 1 W.L.R. 185 at p. 187. On pp. 337 to 338; pp. 189G to 191A he emphasized four main points. First, that it was a long established rule of English law that a

claim in respect of cargo could not be asserted by way of deduction from freight. Secondly, that the status of the rule, as a rule of law, was not affected by the fact that the reason for it could not readily be ascertained. Thirdly, that the principle of abatement at common law was confined to contracts for the sale of goods and contracts for work and labour: it did not extend to contracts for the carriage of goods by sea and it would not be right for the Courts so to extend it. Fourthly, that the parties had contracted on the basis of the rule, and it was not for the Courts to alter that basis even if they were convinced that a different rule would have greater merit. Having dealt with these matters Lord Wilberforce turned to the question of equitable set-off, saying, at p. 338; p. 191:

> My Lords, a yet further argument was developed, that the charterers' claim for short delivery might operate by way of equitable set-off — this, on the assumption as I understood it, that the right of deduction at law was not upheld. This contention was given more prominence in this House than perhaps it received in the Court of Appeal's judgments in *The Brede*, [1973] 2 Lloyd's Rep. 333; [1974] Q.B. 233 though in fact it appears to have been given adequate consideration in that case. It does not appear to me to advance the appellants' case. One thing is certainly clear about the doctrine of equitable set-off — complicated though it may have become from its involvement with procedural matters — namely, that for it to apply, there must be some equity, some ground for equitable intervention, other that the mere existence of a cross-claim (see *Rawson v. Samuel*, (1839) 1 Cr. & Ph. 161 at p. 178, per Lord Cottenham L.C., *Best v. Hill*, (1872) L.R. 8 C.P. 10 at p. 15, and the modern case of *Hanak v. Green*, [1958] 2 Q.B. 9, at p. 19, per Lord Justice Morris). But in this case Counsel could not suggest, and I cannot detect, any such equity sufficient to operate the mechanism, so as, in effect, to override a clear rule of the common law on the basis of which the parties contracted. It is significant that in no case since the Judicature Act, 1873 or at a time before that Act when equitable jurisdiction was available to a Court dealing with the claim, was any such equitable set-off or equitable defence upheld or, until *The Brede*, [1973] 2 Lloyd's Rep. 333; [1974] Q.B. 233, suggested.

Lord Simon of Glaisdale also dealt with the question of equitable set-off, at p. 340; p. 193 where he said:

> The argument from equity fails, in my respectful opinion, for a number of reasons. First, the mere existence of cross-claims per se did not give rise to equitable intervention: it was not enough that they arose from the same contract; the equity of the bill had to impeach the title to the legal demand (Lord Cottenham L.C. in *Rawson v. Samuel* 1 Cr. & Ph. 161 at pp. 178 and 179). The title to a claim for freight is not impeached by short delivery of cargo — unless, of course, the latter amounts to repudiation of the contract. Secondly, there is no record of equity having in fact intervened at any time before the Common Law Procedure Act. . . . Thirdly, there is no record of the alleged equitable defence having been essayed at any time since the Judicature Act 1873. Equity did not bark at all at a claim for freight during this century-long night: to adopt Holmes this would be a curious incident . . . Fourthly, the cases of assignment like *Newfoundland Government v. Newfoundland Railway Co.*, (1888) 13 App. Cas. 199, on which the appellant so greatly relied, are clearly distinguishable. You cannot equitably take the benefit of an assignment without also assuming the burdens; both flow out of and are inseparably connected with the same transaction. . . . Fifthly, at the time of *Model v. Steel*, (1841) 8 M. & W. 858 the Court of Exchequer itself still had an equitable jurisdiction; but it seems to have occurred to no one that any rule of equitable set-off affected the situation.

There are certain observations which I would make with regard to the passages from the speeches of Lord Wilberforce and Lord Simon of Glaisdale quoted above. First, the cross-claim of the charterers which they held could not operate as a defence by way of legal set-off to a claim for freight was, as I indicated earlier, a cross-claim based on a non-repudiatory breach of contract, namely, short delivery of cargo. Lord Wilberforce did not deal with the question whether a cross-claim based on repudiation of a charter-party could or could not operate as such a defence. He did not do so because the case before him did not raise that question. Lord Simon of Glaisdale did refer to repudiation when he said, at p. 340, col. 1; p. 193D:

> . . . The title to a claim for freight is not impeached by short delivery of cargo — unless, of course, the latter amounts to repudiation of the contract . . .

It is not entirely clear to what kind of repudiation Lord Simon of Glaisdale was there referring. Since, however, he was dealing with a case