in which freight was only payable on delivery, it seems likely that he was referring to repudiation in the form of total failure to deliver, a failure which would of itself prevent freight becoming payable at all. In any case it is clear that he was not referring to a case like the present one, in which, after the owners' right to advance freight had accrued, they then repudiated the charter-party.

Secondly, both Lord Wilberforce and Lord Simon of Glaisdale considered that the characteristic of a cross-claim necessary to enable it to operate as a defence by way of equitable set-off was the characteristic prescribed by Lord Cottenham L.C. in *Rawson v. Samuel*, 1 Cr. & Ph. 161 at p. 179, namely, that the cross-claim impeached the title to the legal demand. Lord Wilberforce added [1977] 1 Lloyds Rep. 334 at p. 338; [1977] 1 W.L.R. 185 at p. 191, that it must create an equity sufficient to override a clear rule on the basis of which the parties contracted.

Thirdly, Lord Simon of Glaisdale, at p. 340; p. 193, distinguished cases of assignment, such as *Government of Newfoundland v. Newfoundland Railway Co.*, (1887) 13 App. Cas. 199 on the basis that one cannot take the benefit of an assignment without assuming the burdens, because both flow out of and are inseparably connected with the same transaction. With great respect to Lord Simon of Glaisdale, I believe him to have been in error on this point. The decision in the *Newfoundland* case was that the government's cross-claim for damage caused by the company's failure to complete the railway line could operate as a defence by way of equitable set-off against both the company and the assignees, no distinction in this respect being drawn between the two. It is essential to bear in mind, however, that the company's claim in that case was a claim for subsidy under the particular terms of what was in essence a building contract, so that the special character which the law attaches to a claim for freight under a contract for the carriage of goods by sea was in no way relevant.

My Lords, in *The Aries*, [1977] 1 Lloyd's Rep. 334 at pp. 340 and 342; [1977] 1 W.L.R. 185 at pp. 191 and 197, Viscount Dilhorne and Lord Edmund-Davies agreed with Lord Wilberforce on all points. Lord Salmon delivered a separate speech, agreeing substantially with Lord Wilberforce, except on the question of the prescriptive effect of art. III, r. 6 of the Hague Rules, with regard to which he reserved his opinion.

The speeches of Lord Wilberforce and Lord Simon of Glaisdale in *The Aries* make it clear that, when an owner's breach of charter-party is of a non-repudiatory character, such as partial loss of or damage to cargo, it does not give rise to an equity in favour of the charterers sufficient to override the established rule against deduction. The question for decision in the present case is whether, where an owner's breach of charter-party is of a repudiatory character, it does give rise to such an equity.

Various arguments can be advanced to support an affirmative answer to that question. First, it can be said that a repudiatory breach or breach of a voyage charter-party by an owner, occurring after the right to the payment to him of advance freight has accrued, satisfies the test for a defence by way of equitable set-off laid down in *Rawson v. Samuel*, (1839) 1 Cr. & Ph. 161 of giving rise to an equity sufficient to "impeach the legal title" to the claim for such advance freight. I find it difficult, however, to see how, when a charter-party expressly provides, in effect, that the legal title to advance freight is to be deemed to be complete on the signing of bills of lading, a subsequent breach of the charter-party, even one of a repudiatory character, can properly be regarded as impeaching that title.

Secondly and alternatively, it can be said that a claim based on a repudiatory breach of a voyage charter-party by an owner, occurring after the right to the payment to him of advance freight has accrued, satisfies the test for an equitable set-off laid down in *Government of Newfoundland v. Newfoundland Railway Co.*, (1888) 13 App. Cas. 199 of being a breach flowing out of and being inseparably connected with the transaction, namely, the charter-party which gave rise to the claim for such advance freight. The same might be said, however, of claims with regard to non-repudiatory breaches, such as partial loss of or damage to cargo, in respect of which *The Aries*, [1977] 1 Lloyd's Rep. 334; [1977] 1 W.L.R. 185 is conclusive authority that they do not give rise to a defence by way of equitable set-off.

Thirdly, it can be said that the rule against deduction is in any case anomalous; that it has hitherto been applied only to cases of non-repudiatory breach; and that the Courts ought not to extend its application to cases of repudiatory breach. In my view, however, there is little force in this argument, because a case like the present one seems never to have arisen before, and it is unlikely, except very rarely, that it will arise again.

Once the three arguments discussed above are rejected, as I think on the grounds which I have given that they should be, it is possible to

state a number of good reasons for holding that a repudiatory breach of a voyage charter-party is no more capable of giving rise to a defence by way of equitable set-off than is a non-repudiatory breach. I shall set out those reasons shortly first and then develop them. The first reason is that a repudiatory breach of a charter-party by an owner does not necessarily cause more damage to a charterer than a non-repudiatory breach; it may cause less. There is, therefore, no justification based on quantum of damage for applying the rule against deduction to the latter breach but not to the former. The second reason is that the application of the rule against deduction only works to the ultimate disadvantage of a charterer when the owner's financial situation makes it impossible for a counterclaim to be enforced against him. That risk, however, exists whether the breach is repudiatory or non-repudiatory. The third reason lies in the manner in which the legislation has treated the premature termination of a voyage charter-party by frustration.

With regard to the first reason it is easy to visualize a case where partial loss of or damage to a valuable cargo would cause greater loss to a charterer than a premature termination of the voyage as a result of accepted repudiation, especially if the latter occurred at a late stage of the voyage rather than an early one. Yet, if the contentions for the charterers are right, the rule against deduction would apply to the former greater loss but not to the latter lesser loss. It is difficult to see any justification for this.

With regard to the second reason, provided that an owner's financial situation is such that a counterclaim for damages can be enforced against him, the charterer will not in the end suffer from the application of the rule against deduction. A good illustration of this is to be found in *Great Indian Peninsular Railway Co. v. Turnbull*, (1885) 53 L.T. 325. In that case a steamer was chartered to carry a cargo of coal from Birkenhead to Bombay. The charter-party provided that four-fifths of the freight was to be paid in case in one month from the ship's sailing from her last port in Great Britain, steamer lost or not lost. The perils excluded by the charter-party did not include negligence of the master. The ship sailed with her cargo on July 12, 1884 and was lost through the negligence of the master on July 19, the loss being known in England on July 21. On July 26 the charterers paid four-fifths of the freight to the owners. In an action subsequently brought by the charterers against the owners for damages for breach of the charter-party resulting in the loss of the cargo, it was held, first, that the expression "steamer lost or not lost" did not apply to a loss caused by the master's negligence, and, secondly, that the charterers were entitled to include in the damages recoverable by them the four-fifths of the freight which they had paid in advance. The risk of a charterer's counterclaim being defeated by insolvency of the owner can arise when such counterclaim is based on a non-repudiatory breach as well as when it is based on a repudiatory breach, so that, since the rule against deduction applies in the former case, there is no good reason, so far as that risk is concerned, why it should not also do so in the latter case.

The third reason requires rather more elaboration. At common law frustration of a contract did not cause it to be rescinded ab initio, but terminated it forthwith on the occurrence of the frustrating event. The effect of such termination was to release both parties from further performance of the contract, while leaving intact any payments already made and any rights already acquired under it. Put shortly, the principle followed by the common law was that, on a contract being frustrated, losses and gains lay where they fell and no adjustment of the parties' rights could be made. So in the case of a voyage charter-party stipulating for the payment of freight in advance, if the charter-party became frustrated after the date for such payment had passed, the result was this: if the charterer had already paid the advance freight, he had no right to recover it back, while, if he had not already paid it, he remained obliged to do so. If authority for these propositions is needed, it is to be found in the advice of Mr. Justice Brett to the House of Lords in *Allison v. Bristol Marine Insurance Co. Ltd.*, (1876) 1 App. Cas. 209 at p. 226. One modification to the common law of frustration as it had previously been understood to be was made by the decision of your Lordships' House in *Fibrosa Spolka Akcyjna v. Fairbairn Lawson Combe Barbour Ltd.*, (1942) 73 Ll.L.Rep. 45; [1943] A.C. 32. That modification was that, when, as a result of a contract being frustrated, there was a total failure of consideration for a payment already made, the payment could be recovered by the payor as money had and received to his use. This modification, however, was of a very limited effect, since it left untouched payments in respect of which the consideration had failed partly but not wholly.

The law relating to the frustration of contracts as I have described it was radically altered, soon after the decision in the *Fibrosa* case referred to above, by the passing of the

Law Reform (Frustrated Contracts) Act, 1943. That Act, except in the case of a few specified kinds of contract, got rid of the common law principle that, upon a contract being frustrated, losses and gains lay where they fell, and substituted for it an elaborate code by which the rights of the parties could be re-adjusted in an equitable manner. It is not necessary to go into the details of this code of readjustment: it is sufficient to say that it included, where appropriate, repayment in whole or in part of payments already made by one party to the other, and the release of a party in whole or in part from obligations to make payments already accrued due: see s. 1(2) including the proviso to it.

The significance of the 1943 Act for present purposes, however, lies in the fact that, as I indicated earlier, certain specified contracts are excluded from its application. These contracts include:

> . . . any charterparty, except a time charterparty or a charterparty by way of demise [and] any contract (other than a charterparty) for the carriage of goods by sea. [see s. 2(5)(a).]

The legislature must have had a reason for this exclusion and the only reason which it seems to me that it could have had is an unwillingness to create a situation in which, following the frustration of contracts of this kind, advance freight already due could, if paid, be recovered back in whole or in part, or, if not paid, cease to be payable in whole or in part. In other words the legislature was preserving, in the context of the premature termination of such contracts by frustration, the indefeasibility of an accrued right to advance freight. The attitude of the legislature in this respect seems to me to make it difficult to say that, when a voyage charterparty or other contract for the carriage of goods by sea is prematurely terminated by the owner's repudiation of it, the indefeasibility of an accrued right to advance freight should not be similarly preserved by applying the rule against deduction to the situation so created.

It was argued for the charterers that, where a Court had before it in the same action an owner's claim for freight under a charter-party and a charterer's counterclaim for damages for breach of that charter-party, it could by procedural means bring about a set-off of the counterclaim against the claim, even though, under the substantive law governing the rights of the parties, no such set-off was available. The Court, it was said, could try and determine both the owner's claim for freight and the charterer's counterclaim for damages, and then, supposing both to have succeeded in whole or in part, exercise its power under R.S.C., O. 15, r. 2(4) which provides:

> Where a defendant establishes a counterclaim against the claim of a plaintiff and there is a balance in favour of one of the parties, the court may give judgment for the balance . . .

It was further argued that, if the Court could act in this way, arbitrators could do the same thing. The practical result would be a set-off, by procedural means, between the owner's claim for freight and the charterer's counterclaim for damages.

In my opinion, for the Court to act in the manner suggested would constitute a wrong exercise of its discretion, because it would involve using rules of procedure to bring about a result contrary to the rights of the parties under the substantive law. That would be inconsistent with the principle that the Judicature Acts, while making important changes in procedure, did not alter and were not intended to alter the rights of parties: see *Stumore v. Campbell & Co.*, [1892] 1 Q.B. 314, per Lord Esher M.R. at p. 316 and per Lord Justice Lopes at p. 318.

For the reasons which I have given I would answer question (3) by saying that, if the owners had not assigned their right to freight to the bank, the charterers would not have been entitled to set off against such right the damage suffered by them as a result of the owners' repudiation of the charter-party.

*Question (4): Set-off as between charterers and bank*

The bank's claim for freight against the charterers was brought by it as legal assignee of the owners. It follows that the bank's rights against the charterers are governed by s. 136(1) of the Law of Property Act, 1925, which provides:

> Any absolute assignment by writing under the hand of the assignor (not purporting to be by way of charge only) of any debt or other legal thing in action, of which express notice in writing has been given to the debtor, trustee or other person from whom the assignor would have been entitled to claim such debt or thing in action, is effectual in law (subject to equities have priority over the right of the assignee) to pass and transfer from the date of such notice — (a) the legal right to such debt or thing in action; (b) all legal and other remedies for the same; and (c) the power to give a good discharge for the same without the concurrence of the assignor . . .

It was contended for the charterers, that, even if, as I have held in answering question (3), they were not entitled to set up their counterclaim in respect of the damages suffered by them as a result of the owners' repudiation of the charter-party as a defence by way of equitable set-off as between them and the owners, they were nevertheless entitled to rely on such counterclaim as a defence as between them and the bank, on the ground that it constituted an equity to which the assignment of the right to freight was made subject under s. 136(1) above.

In support of this contention for the charterers reliance was placed on certain passages in the judgment of the Privy Council delivered by Lord Hobhouse in *Government of Newfoundland v. Newfoundland Railway Co.*, (1888) 13 App. Cas. 199 and on passages from various textbooks which appear to be largely founded on that case. I discussed the *Newfoundland Railway* case in some detail in connection with question (3), and I also referred to what I respectfully suggested was a misunderstanding about its effect in the speech of Lord Simon of Glaisdale in *The Aries*, [1977] 1 Lloyd's Rep. 334 at p. 340 [1977] 1 W.L.R. 185 at p. 193. The charterers relied particularly for present purposes on a passage in the judgment of Lord Hobhouse immediately preceding the passage at 13 App. Cas. 199 at pp. 212–213, which I quoted earlier. In the passage so relied on by the charterers Lord Hobhouse, referring to the company's claim for subsidy on the one hand, and the government's counterclaim for damages for the failure to complete the railway on the other, said, at p. 212:

> The two claims under consideration have their origin in the same portion of the same contract, where the obligations which gave rise to them are intertwined in the closest manner. The claim of the government does not arise from any fresh transaction freely entered into by it after notice of the assignment by the company. It was utterly powerless to prevent the company from inflicting injury on it by breaking the contract. It would be a lamentable thing if it were found to be the law that a party to a contract may assign a portion of it, perhaps a beneficial portion, so that the assignee shall take the benefit, wholly discharged of any counterclaim by the other party in respect of the rest of the contract, which may be burdensome.

Mr. Justice Hobhouse [1987] 1 Lloyd's Rep. 239 at pp. 254–257 in his judgment in the present case made a very full and careful analysis of the *Newfoundland Railway* case. I respectfully agree with that analysis, and in particular with two matters contained in it. The first matter is that the case was one of equitable set-off, in the sense that it was held that the government's counterclaim in respect of the company's breach of contract in failing to complete the railway, because it flowed out of and was inseparably connected with the contract between the parties, operated as a defence by way of equitable set-off to the company's claim for subsidy. The second matter is that Lord Hobhouse drew no distinction in this respect between the rights of the government against the company on the one hand and its rights against the company's assignees on the other. On the contrary he made it clear that the government's counterclaim operated as a defence by way of equitable set-off both against the company and against the assignees.

Having regard to these matters I do not consider that the *Newfoundland Railway* case affords any support for the contention of the charterers presently under discussion. On the contrary, it seems to be inconsistent with it.

I would, therefore, answer question (4) by saying that the charterers are no more entitled to rely on their counterclaim for damages as a defence by way of equitable set-off against the bank than they would have been entitled to rely on it, but for the assignment, against the owners.

Having regard to the answers which I have given to the four questions discussed above, I would allow the appeal, set aside the order of the Court of Appeal dated Dec. 21, 1987 as later amended and restore the order of Mr. Justice Hobhouse dated Oct. 24 1986.

**Lord OLIVER OF AYLMERTON:** My Lords, I have had the advantage of reading in draft the speech delivered by my noble and learned friend, Lord Brandon of Oakbrook. I agree that the appeal should be allowed for the reasons which he has given.

**Lord GOFF OF CHIEVELEY:** My Lords, for the reasons given by my noble and learned friend, Lord Brandon of Oakbrook, I would allow this appeal.

**Lord JAUNCEY OF TULLICHETTLE:** My Lords, I have had the opportunity of considering in draft the speech to be delivered by my noble and learned friend Lord Brandon of Oakbrook. I agree with it, and for the reasons he gives would allow the appeal.

THE COMMON LAW LIBRARY

# CHITTY ON CONTRACTS

TWENTY-NINTH EDITION

Volume I

GENERAL PRINCIPLES

LONDON
SWEET & MAXWELL
2004

14

# Chapter 24

# DISCHARGE BY BREACH

|    |                                      | PARA.  |
|----|--------------------------------------|--------|
| 1. | In general                           | 24-001 |
| 2. | Renunciation                         | 24-018 |
| 3. | Impossibility created by one party   | 24-028 |
| 4. | Failure of performance               | 24-034 |
| 5. | Consequences of discharge            | 24-047 |

## 1. IN GENERAL[1]

**Discharge by breach.** One party to a contract may, by reason of the other's breach, be entitled to treat himself as discharged from his liability further to perform his own unperformed obligations under the contract and from his obligation to accept performance by the other party if made or tendered.[2] The expression "discharge by breach" is commonly employed to describe the situation where he is entitled to, and does, exercise that right. Nevertheless, the expression is not wholly accurate, at least without further explanation. In the first place, not every breach of contract has this effect. Discharge from liability is not necessarily coincident with a right to sue for damages. The rule is usually stated as follows: "Any breach of contract gives rise to a cause of action; not every breach gives a discharge from liability." Thus the main question discussed in this chapter is whether a party who admittedly has a claim for damages is also relieved from further performance by the other party's breach.[3] Secondly, although sometimes the innocent party is referred to as "rescinding" the contract and the contract as being "terminated" by the breach, it is clear that the contract

24-001

---

[1] See Lord Devlin [1967] Camb.L.J. 192; Reynolds (1963) 79 L.Q.R. 534; Treitel (1967) 30 M.L.R. 139; Shea (1979) 42 M.L.R. 623; Beatson (1981) 97 L.Q.R. 389; Rose (1981) 34 C.L.P. 235; Carter, *Breach of Contract* (2nd ed., 1991).

[2] This principle would appear to apply to leases: see *Hussain v Mehlman* [1992] 2 E.G.L.R. 87; *Progressive House Pty Ltd v Tabali Pty Ltd* (1985) 157 C.L.R. 17; *Highway Properties Ltd v Kelly, Douglas & Co* (1971) 17 D.L.R. (3d) 710; cf. *Total Oil Great Britain Ltd v Thompson Garages (Biggin Hill) Ltd* [1972] 1 Q.B. 318. See further Pawlowski [1995] Conv. 379.

[3] While the general law entitles a party to refuse to continue with performance in circumstances to be discussed in this chapter, the terms of the contract between the parties may give to one or both of the parties a right to terminate the contract in the event of a breach of contract by the other party. The right so conferred may be broader than that which would otherwise exist under the general law; in other words, the clause may entitle a party to terminate in the event of a breach which would not otherwise be regarded by the law as a repudiatory breach. The scope of the termination clause is in all cases a question of interpretation of the particular clause, on which see further para.22-047, n.192.

24–001    CHAP. 24—DISCHARGE BY BREACH

is not rescinded *ab initio*[4] nor is it extinguished by the breach.[5] The innocent party, or, in some cases, both parties, are excused from further performance of their primary obligations under the contract; but there is then substituted for the primary obligations of the party in default a secondary obligation to pay monetary compensation for his non-performance.[6] Thirdly, the innocent party is not ordinarily[7] bound to treat himself as discharged: if the contract is still executory, he may elect instead to treat it as continuing.[8] He may also waive his right of discharge, accept the defective performance of the other party, and content himself with damages, which are his remedy in any event.[9]

24–002    **A middle ground.** An innocent party, faced by a repudiatory breach, is therefore given a choice: he can either treat the contract as continuing ("affirmation" of the contract) or he can bring it to an end ("acceptance of the repudiation"). He must "elect" or choose between these options. Further, it is sometimes said that there is no other option open to the innocent party; that is to say, there is no "middle way" or "third choice".[10] This is true in the sense that there is no "third choice, as a sort of via media, to affirm the contract and yet be absolved from tendering further performance unless and until [the breaching party] gives reasonable notice that he is once again able and willing to perform."[11] But the proposition that there is no middle way can be over-stated. There is a sense in

which there is a mid of time in which to or terminate. This p *v Latvian Shipping*

"In my judgment, th and affirmation of th up his mind what to the law will treat hi moment, while rese in his repudiation, th innocent party runs in water' until acc innocent party's rig He also runs the ris performance of the elect to accept the

The length of the pe will very much dep one because a party the contract.[14] The innocent party's obl until it has been te: elected to terminate the effect of the ot party's obligation t

**Affirmation.** W treat the contract a: discharged, elects t "affirmed" the cor contract unless, firs and, secondly, he

---

[4] *Heyman v Darwins Ltd* [1942] A.C. 356, 373, 399; *Johnson v Agnew* [1980] A.C. 367, 373; *Photo Production Ltd v Securicor Transport Ltd* [1980] A.C. 827, 844; *Bank of Boston Connecticut v European Grain and Shipping Ltd* [1989] A.C. 1056, 1098–1099; *State Trading Corp. of India Ltd v M. Golodetz Ltd* [1989] 2 Lloyd's Rep. 277, 286. See below, para.24–047.

[5] *Photo Production Ltd v Securicor Transport Ltd*, above (overruling *Harbutt's "Plasticine" Ltd v Wayne Tank and Pump Co Ltd* [1970] 1 Q.B. 447). See above, para.14–022; below, para.24–047.

[6] *R. V. Ward Ltd v Bignall* [1967] 1 Q.B. 534, 548; *Moschi v Lep Air Services Ltd* [1973] A.C. 331, 345, 350, 351; *Hyundai Ltd v Pournaras* [1978] 2 Lloyd's Rep. 502, 507; *Photo Production Ltd v Securicor Transport Ltd*, above, at 848–851. See below, para.24–052.

[7] On the question of whether the wrongful dismissal of an employee from his contract of employment constitutes an exception to the rule, see Vol.II, para.39–186. See also *Thomas Marshall (Exports) Ltd v Guinle* [1979] Ch. 227 (repudiation by employee).

[8] *Avery v Bowden* (1855) 5 E. & B. 714; (1856) 6 E. & B. 953; *Frost v Knight* (1872) L.R. 7 Ex. 111, 112; *Johnstone v Milling* (1886) 16 Q.B.D. 460, 470; *Michael v Hart & Co* [1902] 1 K.B. 482, 492; *Tredegar Iron and Coal Co Ltd v Hawthorn Bros & Co* (1902) 18 T.L.R. 716; *Hain SS. Co Ltd v Tate & Lyle Ltd* (1936) 41 Com.Cas. 350, 355, 363; *Heyman v Darwins Ltd* [1942] A.C. 356, 361; *Chandris v Isbrandtsen Moller Co Inc.* [1951] 1 K.B. 240, 248; *Howard v Pickford Tool Co Inc.* [1951] 1 K.B. 417, 421; *White & Carter (Councils) Ltd v McGregor* [1962] A.C. 413; *Cranleigh Precision Engineering Ltd v Bryant* [1965] 1 W.L.R. 1293; *Suisse Atlantique Société d'Armement Maritime SA v N.V. Rotterdamsche Kolen Centrale* [1967] 1 A.C. 361, 398, 418; *Decro-Wall International SA v Practitioners in Marketing Ltd* [1971] 1 W.L.R. 361, 368, 375, 381; *Mayfair Photographic Supplies Ltd v Baxter Hoare & Co Ltd* [1972] 1 Lloyd's Rep. 410, 417; *Lakshmijit v Sherani* [1974] A.C. 605; *Thomas Marshall (Exports) Ltd v Guinle*, above; *Tai Hing Cotton Mill Ltd v Kamsing Knitting Factory* [1979] A.C. 91; *Fercometal S.A.R.L. v Mediterranean Shipping Co SA* [1989] A.C. 788; *Vitol SA v Norelf* [1996] A.C. 800.

[9] *Bentsen v Taylor, Sons & Co* [1893] 2 Q.B. 274; *Wallis, Son and Wells v Pratt and Haynes* [1911] A.C. 394; *Hain SS. Co Ltd v Tate & Lyle Ltd*, above; *Chandris v Isbrandtsen Moller Co Inc.*, above; *Suisse Atlantique Société d'Armement Maritime SA v N.V. Rotterdamsche Kolen Centrale*, above; Sale of Goods Act 1979, s.11(2). See also below, para.24–003 (affirmation).

[10] *Bentsen v Taylor* [1893] 2 Q.B. 274, 279; *Fercometal S.A.R.L. v Mediterranean Shipping Co SA* [1989] A.C. 788, 799–801; *Motor Oil Hellas (Corinth) Refineries SA v Shipping Corp. of India* [1990] 1 Lloyd's Rep. 391, 398–399.

[11] *Fercometal S.A.R.L. v Mediterranean Shipping Co SA* [1989] A.C. 788, 801.

[12] [2002] EWCA Civ EWHC 725 (TCC); [20
[13] *ibid.* at [87].
[14] *cf. W.E. Cox Tone:* elect within a reasonabl that mere delay by itsel
[15] See Treitel *The L* 24–037.
[16] *Suisse Atlantique S* 1 A.C. 361, 398; *Peym*
[17] *Matthews v Small of Greece* [1964] 1 Lloy *Rotterdamsche Kolen C Co* [1970] 1 Lloyd's R [1971] A.C. 850; *Peym of Liberia* [1996] 2 Ll