William R. Bennett, III (WB 1383)
Bennett, Giuliano, McDonnell & Perrone, LLP
Attorneys for Defendant
SINORCHES GLOBAL LTD.
494 Eighth Avenue, 7th Floor
New York, New York 10122
Telephone:   (646) 328-0120
Facsimile:   (646) 328-0121

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------X
CALDER SEACARRIER CORP.,                           07 Civ. 6520 (LAK)

                    Plaintiff,

     - against –

VIKING MARINE S.A. and SINORICHES GLOBAL
LTD. a/k/a/ SGL SHIPPING LIMITED,

                    Defendants.
-------------------------------------------------------------X

## REPLY MEMORANDUM OF LAW IN SUPPORT OF DEFENDANT SINORICHES GLOBAL LTD.'S MOTION TO DISMISS THE COMPLAINT

Submitted by,

William R. Bennett, III (WB 1383)
Bennett, Giuliano, McDonnell & Perrone, LLP
Attorneys for Defendant
SINORCHES GLOBAL LTD.
494 Eighth Avenue, 7th Floor
New York, New York 10001
Telephone:   (646) 328-0120
Facsimile:   (646) 328-0121

## INTRODUCTION

Defendant, Sinoriches Global Limited ("Sinoriches"), submits this Reply Memorandum of Law in support of its motion to dismiss the complaint on the grounds that plaintiff (1) fails to state a claim upon which relief may be granted; and (2) lacks standing to sue.

Because Plaintiff has failed to meet its burden of proof establishing it has standing to sue or that it has a claim upon which relief may be granted, Sinoriches motion must be granted.

## PROCEDURAL ISSUES

Plaintiff criticizes defendant for bringing this motion, incorrectly labeling the motion as an effort to vacate the Rule B attachment. While the effect of a dismissal of the complaint would be a vacatur of the attachment, the plaintiff's motion does not attack the procedural manner in which the attachment was permitted, but rather attacks the merits of plaintiff's claim. Defendants concede that its Rule E motion to vacate the Rule B attachment was denied. Under Rule E, however, the plaintiff's burden of proof to avoid the vacatur of a Rule B attachment is very limited and only requires plaintiff to establish that the technical requirements of Rule B have been satisfied. Aqua Stoli Shipping Ltd. v. Gardner Smith Pty. Ltd., 460 F.3d 434 (2d Cir. 2006.)

Here, Defendant is not attacking the procedural steps plaintiff took to obtain the attachment, but rather, is attacking the right of plaintiff to bring the claim and whether such a claim does exist. Plaintiff has not established that defendant is not entitled to make such a motion and no case law appears to bar defendant form doing so. Cf. Deuilemar Compagnia Di Navigazione SpA v. Dabkomar Bulk Carrier Limited, 2006 WL 317241 (S.D.N.Y.)(Court entertained motions pursuant to Rule E and 12(b)).

In opposing the motion, plaintiff does not provide an affidavit, declaration or any other credible evidence from a person with knowledge or information regarding the relevant

2

transactions between the parties, but rather offers, in the form of a "data dump", voluminous, irrelevant and somewhat confusing declarations and documents that appear to have been submitted in the arbitration in London; none of which meets plaintiff's burden of establishing that it has standing or a viable claim against Sinoriches.

**POINT I**

**THE PLAINTIFF HAS NOT ESTABLISHED IT HAD AN INTEREST IN THE M/V VERA WHICH ENTITLED IT TO COLLECT FRIEGHT FROM SINORICHES, NOR HAS IT ESTABLISHED THAT IT SUFFERED ANY DAMAGES, ACCORDINGLY PLAINTIFF'S CLAIM MUST BE DISMISSED.**

Calder alleges that it chartered the M/V VERA from the owner, co-defendant Viking, for a lump sum freight of $2,622,500 and that Viking did not provide the M/V VERA as required under the charter party. (See Calder's London Arbitration claim submission attached hereto as Exhibit A, ¶ 1.) Calder further alleges that it then sub-chartered the vessel to Sinoriches for a freight rate that would have required Sinoriches to pay Calder $1,529,360.53. (Plaintiff's Second Amended Complaint, ¶ 35.) There were apparently several other charterers along with Sinoriches that Calder alleges it sub-chartered the M/V VERA to. All of them are accused of breaching their respective charters with Calder.  (See Exhibit A.)

Calder has asserted a claim against Viking in the London arbitration claiming lost profits of $362,638.03. (Exh. A, ¶ 18.) This is the difference between the lump sum freight due from Calder to Viking and the expected freight to be earned by Calder from the sub-charterers sharing the M/V VERA, one of them being Sinoriches. Assuming for the sake of this motion that Calder is correct, and a contract of affreightment was finalized with Sinoriches (which is disputed), Calder has not provided any affidavit, declaration or credible evidence that it paid Viking the lump sum freight of $2,622,500 and had possession, custody or control over the M/V VERA on

3

the date that it was required to provide the vessel to Sinoriches. Accordingly, Calder has failed to establish it had a right to the M/V VERA and standing to sue.

In addition, Calder has failed to establish that it suffered any damages. To the contrary, there is strong evidence that Sinoriches did not cause any damage to Calder. Calder states in the London arbitration that Sinoriches paid Viking $1,398,099.40 in freight and admits Sinoriches paid Calder $131,261.13 in freight. (Exh. A, ¶¶ 14 & 18.) In total, Sinoriches paid $1,529.360.53. Accordingly, Sinoriches alleged freight obligation of $1,529,360.53, as alleged in Second Amended Complaint ¶ 35, was met. Calder suffered no damages as a result of Sinoriches alleged breach.

"To meet the Article III standing requirement, a plaintiff must have suffered an 'injury in fact' that is 'distinct and palpable'; the injury must be fairly traceable to the challenged action; and the injury must be likely redressable by a favorable decision." Denny v. Deutsche Bank AG, 443 F.3d 253, 263 (2d Cir. 2006) (citing Lugan v. Defenders of Wildlife, 504 U.S. 555, 560-61 (1992); Whitmore v. Arkansas, 495 U.S. 149, 155 (1990)).

Further, The Second Circuit has held that, where a party has raised the issue of standing, the District Court has leeway as to the procedure it wishes to follow. See Gibbs v. Buck, 307 U.S. 66, 71-72, 59 S. Ct. 725, 83 L. Ed. 1111 (1939) ("As there is no statutory direction for procedure upon an issue of jurisdiction, the mode of its determination is left to the trial court"). After limited discovery on the jurisdictional issue, see Filus v. Lot Polish Airlines, 907 F.2d 1328, 1322 (2d Cir. 1990), the matter might be appropriate for resolution on motion supported by affidavits, [] see Exchange National Bank v. Touche Ross & Co., 544 F.2d 1126, 1131 (2d Cir. 1976), or, if a genuine dispute of material fact exists, the Court may conduct a hearing limited to Article III standing, see Lawrence v. Dunbar, 919 F.2d 1525, 1529-30 (11th Cir.

4

1990); <u>cf.</u> <u>Ball v. Metallurgie Hoboken-Overpelt, S.A.</u>, 902 F.2d 194, 197 (2d Cir 1990) (outlining similar procedures for establishing personal jurisdiction under Rule 12(b)(2)).

Here there is no distinct and palpable injury, and Calder's claim must be dismissed.

It is plaintiff's burden to prove standing, <u>See</u> <u>Logan</u>, 504 U.S. at 561; <u>accord</u> <u>In re Bennett Funding Group, Inc.</u>, 336 F.3d 94, 102 (2d Cir. 2003), and it has not asked for a hearing or discovery. The Court is, therefore, asked to decide the motion on the papers before it.

Where "the nonmoving party bears the burden of proof at trial; summary judgment is warranted if the non-movant fails to make a showing sufficient to establish the existence of an element essential to [its] case." <u>Nebraska v. Wyoming</u>, 507 U.S. 594, 590 (1993) (quoting <u>Celotex</u>, 477 U.S. at 322). Because Calder failed to come forward with enough evidence to create a genuine factual issue to be tried with respect to an element essential to its case, i.e., that it has standing, Sinoriches must prevail. <u>Allen v. Cuomo</u>, 100 F.3d 253, 258 (2d Cir. 1996) (citing <u>Anderson</u>, 477 U.S. at 247-48.)

Unlike a Rule 4(e) hearing on the issue of vacatur of a Rule B attachment, Calder cannot rest on the mere allegations of its complaint, but must set forth by affidavit or other credible evidence specific facts establishing it has a claim and standing to bring such a claim. See <u>Lugan</u>, 504 U.S. at 561. The non-movant "may not rely on conclusory allegations or unsubstantiated speculation." <u>Scotto v. Almenas</u>, 143 F.3d 105, 114 (2d Cir. 1998); <u>accord</u> <u>Argus, Inc. v. Eastman Kodak Co.</u>, 801 F.2d 38, 42 (2d Cir. 1986), <u>cert denied</u>, 479 U.S. 088 (1987). In other words, Calder was required to offer "concrete evidence" from which a reasonable fact finder could return a verdict in its favor. <u>Anderson</u>, 477 U.S. at 256.

As the Second Circuit has noted, to survive a motion to dismiss on the issue of standing, a plaintiff must set forth facts establishing that all links in the causal chain are satisfied." Garelick v. Sullivan, 987 F.2d 913, 919 (2d Cir.), cert denied, 510 U.S. 821 (1993).

Calder fails to establish that it had paid the freight to Viking and therefore had an interest in the M/V VERA.    In addition, according to Calder's own submissions in the London arbitration, Sinoriches cannot be obligated to pay further "freight, demurrage, port fees and other associated costs" because there was no freight earned by Calder, no demurrage incurred, no port fees paid and no costs incurred by Calder on behalf of Sinoriches.   Because Calder has failed to prove it had an interest in the M/V VERA, it has no standing to claim it is entitled to "freight, demurrage, port fees and other associated costs."

### CONCLUSION

For the reasons stated herein above, Sinoriches' motion should be granted.

Dated: New York, New York
      January 10, 2008

Respectfully submitted,

Bennett, Giuliano, McDonnell & Perrone, LLP
Attorneys for Defendant Calder Seacarrier Corp.

William R. Bennett, III
494 Eighth Avenue, 7th Floor
New York, New York 10001
Telephone:    (646) 328-0120

**TO:**   Garth Wolfson, Esq.
        Mahoney & Keane LLP
        111 Broadway, 10th Flr
        New York, New York 10006

J. Pare, Esq.
Nourse & Bowles
One Exchange Plz
55 Broadway
New York, New York 10006

Richard M. Ziccardi, Esq.
Xylas & Ziccardi, LLP
500 Fifth Avenue
New York, New York 10110

Z:\Documents\All Files\D697\Pleadings\MemoLawReStanding.DOC

# EXHIBIT A

<u>**IN THE MATTER OF THE ARBITRATION ACT 1996**</u>
<u>**AND**</u>
<u>**IN THE MATTER OF AN ARBITRATION**</u>
**B E T W E E N:-**

### CALDER SEACARRIER CORP.

<u>**Claimants/Charterers**</u>

**and**

### VIKING MARINE SA

<u>**Respondents/Owners**</u>

### MV "VERA" C/P DD 06.06.07

### <u>CLAIM SUBMISSIONS</u>

[*References in bold in brackets herein are to pages in the bundle of supporting documents served herewith*]

1.    By a voyage charter ("the Charter") made and/or evidenced by a recap
      email ("the Recap" **(1-8)**)    from brokers to the Claimants
      ("Charterers"), the Respondents ("Owners") agreed to let their vessel
      the "VERA" ("the Vessel") to Charterers for the carriage of up to a full
      and complete cargo of lawful generals/foodstuff/minerals/steel from
      1/3 safe ports in Charterers option in the China/Singapore range to 1/3
      safe ports in Charterers' option in the Mediterranean range for the
      lump sum freight of US$2,622,500 FIOST and on the other terms and
      conditions therein set out and/or thereby incorporated.

2.    The Recap expressly provided and/or there were accordingly express
      terms of the Charter that:

      (1)    "...CHRS HV THE RIGHT TO CALL UNDER THIS C/P TO A TTL OF

1

7 PORTS, SPLITTED IN CHRS OPTION..." (**4**)

(2)    "UP TO FULL AND COMPLETE CGO... OWS GUARANTEE 37.000 MTONS DWCC..." (**4**)

(3)    "FRT PAYABLE... AT EACH PORT PROPORTIONALLY FOR THE QTY LOADED AT THAT PORT." (**4**)

(4)    "OWISE AS PER CHRS CP PROFORMA MV ABEER S WITH LOGICAL AMMENDEMENTS A/O ALTERATIONS AS PER MAIN TERMS" (**5**)

3.    Further as incorporated into the Charter by the Recap, Charterers' pro forma "MV ABEER S" charterparty (which was on an amended Gencon 1994 form (**9-19**)) provided inter alia, and there were accordingly express terms of the Charter that:

(1)    "[By clause 5 (**10**)] The cargo shall be brought into the holds, loaded, stowed and/or trimmed, tallied, lashed and/or secured and taken from the holds and discharged by the Charterers";

(2)    "[By clause 14 (**11**)] Agency ~~In every case the Owners shall appoint their own Agent both at the port of loading and the port of discharging~~";

(3)    "[By additional clause 25 (**13**)] **BILLS OF LADING** ...[A]t charterers option, Master to authorize in writing the charterers agents to sign on his behalf the Bills of Lading."

4.    Further, there were implied terms of the Charter (such implication to be made to give business efficacy thereto and/or as an obvious inference from the circumstances and/or by law) that:

(1)    where Charterers had entered into firm bookings and/or contracts of affreightment for the carriage by the Vessel of cargoes within the terms of the Charter Owners would not seek

2

in any way to induce, procure or cause the shippers thereunder to breach their contracts with Charterers and/or otherwise to interfere with the performance by the shippers of the same;

(2)    Owners would not attempt to suborn Charterers' agents and in particular would not seek to induce them to act or agree to act in a way that might be contrary to Charterers lawful instructions or would place them in an actual or potential conflict of interest with Charterers;

(3)    Owners would co-operate with Charterers and/or their appointed agents in and about the performance of the Charter and in particular would allow them access to the Vessel for the purposes of the express term set out in paragraph 3(1) above;

5.    As they were entitled to do, and/or as contemplated by the terms of the Charter, Charterers entered into the following firm bookings and/or contracts of affreightment in respect of the Vessel, namely:

(1)    a contract made and/or evidenced by a recap dated 7th June 2007 (**20-22**), whereby Charterers agreed with Sinoriches to furnish the Vessel for the carriage of 20,000-21,000 mts steel products (at the latter's option) from Changshu to Ravenna ("the Changshu cargo") for the freight and on the other terms

3

and conditions therein set out and incorporated including the

Gencon 1994 (**21**) form which provides:

**"8. Lien Clause**
The Owners [ie Charterers herein] shall have a lien on the cargo
and on all sub-freights payable in respect of the cargo, for
freight, deadfreight, demurrage, claims for damages and for all
other amounts due under this Charter Party including costs of
recovering the same"

(2)    a contract made and/or evidenced by recap email and a
charterparty on an amended Gencon 1994 form, both dated 13th
June 2007 (**27-37**), whereby Charterers agreed with
Farmbridge Ltd to furnish the Vessel for the carriage of 6,000
mts +/- 3% of steel pipes in bundles from Dalian to Ravenna
("the Dalian Cargo") for the freight of US$ 90 pmt (less a total
of 3.75% commissions) and on the other terms and conditions
there set out and incorporated;

(3)    a contract made and/or evidenced by a recap dated 21st June
2007 (**38-42**), whereby Charterers agreed with Sinoriches
Dalian to furnish the Vessel for the carriage of 5,000 cbm of
machinery and equipment from Lianyungang  for Skikda ("the
Lianyungang Cargo") for the freight and on the terms and
conditions there set out and incorporated;

(4)    a contract made and/or evidenced by a recap dated 4th July
2007(**43-48**), whereby Charterers agreed with MS Steel

4

International to furnish the Vessel for the carriage of 7,800 mts 5% more at the latter's option wire rods from Jingtang to Aqaba ("the Jingtang Cargo") for the freight and on the other terms and conditions there set out and incorporated.

6.    Pursuant to the Charter, Charterers ordered the Vessel to proceed to Changshu and there load the Changshu cargo and in accordance therewith the Vessel proceeded to Changshu and there loaded 21,4372.244 of steel products. Further to pursuant to the term of the Charter pleaded in paragraph 3(3) above, at Charterers' option the Master gave Penavico written authorization to sign on his behalf the bills of lading relating thereto (**48**).

7.    Wrongfully and in breach of the implied term set out in paragraph 4(1) above, from about 29th June 2007 Owners, in particular by emails from their agents Priamos Maritime SA ("Priamos"), sought to suborn Charterers' appointed agents at Changshu, Penavico Changshu Agency, into agreeing to act contrary to Charterers' lawful instructions and/or on behalf of Owners and/or to accept obligations towards Owners that might cause an actual or potential conflict with their obligations towards Charterers (**55-60**).

8.    Pursuant to the Charter Charterers ordered the Vessel to proceed to Dalian and there load the Dalian cargo. The Vessel proceeded to Dalian

5

and started to load the Dalian cargo having by 3rd July 2007 loaded about 1330 mts thereof. However, Owners by the Master and/or Priamos, inter alia:

(1)     on 3rd July 2007 wrongfully and in breach of the implied term set out in paragraph 4(1) above sought by email to suborn Charterers' appointed agents at Dalian, Sinoagents, into agreeing to act contrary to Charterers' lawful instructions and/or on behalf of Owners and/or to accept obligations towards Owners that might cause an actual or potential conflict with their obligations towards Charterers (**63, 68-71,73,76**);

(2)     on 3rd July 2007 (when Sinoagents refused to be suborned) in breach of the implied term set out in paragraph 4(2) above excluded them from the Vessel and/or disallowed them any access to the same (**69, 76-79,81**);

(3)     on and from about $3^{rd}/4^{th}$ July 2007, in repudiatory breach and/or repudiation and/or renunciation of the Charter: ceased loading the Dalian Cargo and/or threatened to discharge that part thereof that had been loaded and/or to sail to Ravenna to discharge the Changshu Cargo upon payment of the entire lumpsum freight and/or removed the Vessel from the effective disposition of Charterers (**86-89,91-94,96-114**);

6

(4)     on 4th July 2007, in breach of the express term set out in paragraph 2(3) above, demanded payment of the entire lumpsum freight of US$2,622,500 less 2.5% commission amounting to US$2,556,937.50 (**90**).

9.     Nevertheless on 4th July 2007 and pursuant to the Charter, Charterers gave orders via brokers to the Vessel to resume and complete the loading of the Dalian Cargo; thereafter to proceed to Jingtang and there load the Jingtang Cargo for Aqaba; thereafter to proceed to Lianyungang and there load the Lianyungang Cargo for Skikda and thereafter to carry the loaded cargoes to the discharge ports for discharge in geographical rotation namely: Aqaba, Ravenna, Skikda (**104-5**).

10.     However on 6th July 2007, Owners failed and/or refused to comply with Charterers' said orders (**111**) knowing of the existence a contract of affreightment between Charterers and Farmbridge Limited pleaded in paragraph 5(2) above and of substantially all of its terms and intending that Farmbridge Ltd should not comply with and so breach that contract (in particular the provision therein for freight to be paid to Charterers at the rate of US$90 pmt less a total of 3.75% commission), wrongfully and in repudiatory breach of the Charter Owners procured and/or induced Farmbridge Ltd (**122-127, 130**) to breach its contract

7

with Charterers by entering into a wholly incompatible and/or inconsistent contract with Owners instead of Charterers on substantially identical terms except at a freight rate of US$86 pmt less a total of 2.5% commission (**133-139**) (had they performed the Charter, Owners' remuneration in respect of all cargo shipped under the Charter would have been at approximately the effective rate US$ 2,622,500/37,000 mts = US$70.88 pmt less 2.5% commission). Thereafter the Owners completed the loading of the Dalian Cargo with their own appointed agents, pursuant to their new arrangements with Farmbridge Ltd and not pursuant to the Charter (**115-6, 132, 142**).

11.   Further, wrongfully and in breach of the implied term set out in paragraph 4(3) above, on about 11th July 2007 Owners communicated with and/or made approaches to, and/or otherwise sought to interfere with MS Steel so as to cause them to cancel their contract with Charterers set out in paragraph 5(3) above (**155**). Charterers reserve the right to add to, vary or amend this paragraph after disclosure and/or the administration of interrogatories and/or Requests for Further Information herein.

12.   Further by emails and/or fax messages sent between about 11th July 2007 and 19th July 2007 via brokers and/or their solicitors herein, Hill Dickinson International, Owners in various ways and in various terms threatened not to and/or indicated their intentions not to act in

8

15.     On 19th July by email from Charterers' solicitors Fishers to Owners
        Solicitors Hill Dickinson International, Charterers, as they were entitled
        to do, accepted the above repudiatory breaches and/or repudiation
        and/or renunciation of the Charter thereby terminating the same (**210-
        213**).

16.     Further at all material times from before about 18th July and as they
        were entitled to do, Charterers exercised and/or asserted their rights of
        lien over the Changshu cargo pursuant to the term of the Sinoriches
        contract pleaded in paragraph 5(1) above by, inter alia, retaining
        through their agents Penavico, possession and/or control of the bills of
        lading relating thereto that had been duly signed by Penavico on behalf
        of the Master pursuant to the authority set out in paragraph 6 above
        (**196, 198, 208, 217-218**).

17.     Further on and/or from about 25th July 2007 knowing of the existence
        of the Sinoriches contract and its substantial terms including
        Charterers' contractual lien over the Changshu Cargo, Owners
        wrongfully sought to induce Sinoriches to breach its contract with
        Charterers by acting in concert with Owners in and about the issue of
        purported bills of lading in respect thereof which were not issued
        pursuant to the Charter, to be issued to third parties in order to defeat
        Charterers' contractual lien over the Changshu cargo. Charterers
        reserve the right to add to, vary or amend this paragraph after

                                        10

disclosure and/or the administration of interrogatories and/or Requests for Further Information herein.

18. By reason of the matters aforesaid the Charterers have suffered loss and damage and been put to expense.

PARTICULARS

A.    Loss of profits of the Charter                    US$362,638.03
      (See schedule (**229-230**))

B.    Anticipated claims from shippers                  US$200,000

C.    Further in respect of any damages awarded to the Owners herein in tort Charterers will seek an additional award of aggravated and/or exemplary ges on the grounds, inter alia, that:

(1)    these torts were committed by Owners in the course of a particularly aggravating and/or vexatious and/or cynical course of conduct. Charterers will rely on the facts and matters above pleaded and Owners' communications therein referred to and will rely upon, in particular: (a) Owner's readiness to breach or threaten to breach the Charter to seek to force Charterers to comply with their demands were not met; and (b) their repeated yet groundless accusations and suggestions to Charterers and others that Charterers had somehow acted in bad faith/criminally/fraudulently     (**93-94,95-97,107-108, 121-123, 132,142,145-146**); and/or

accordance with Charter and repeatedly evinced their intention not to be bound thereby and thereby repudiated and/or renounced the same (**172-3, 175-185, 192**).

13.   Further, on about 18th and/or 19th July 2007, in further repudiatory breach and/or repudiation and/or renunciation of the Charter Owners deviated from the Charter and/or removed the Vessel completely from its service thereunder and/or its performance of the Charter and/or from the effective disposition of Charterers thereunder by employing it so as to proceed to Xingang for a cargo of 4200 mts wire rods for Catania Italy, for their own account.

14.   Further on 17th and/or 18th and/or 19th July 2007, wrongfully and in repudiatory breach of and/or repudiation and/or renunciation of the Charter, knowing of the existence of the Sinoriches contract and of its substantial terms and in particular that Sinoriches were bound to pay freight to Charterers in respect of the Changshu cargo, and intending that Sinoriches should breach that contract, by, inter alia, email messages from its agents Priamos induced Sinoriches to breach its contract with Charterers by paying the substantial part of that freight alternatively substantially all of that freight (US$1,140,378.30 + US$257,721.10 amounting to US$1,398,099.40) to Owners rather than to Charterers.

(2)     these torts were committed by Owners on the basis of a an assessment or calculation that the profits they would make as a result thereof would exceed any damages and/or other compensation they would have to pay Charterers as a result thereof and/or that they would be able to manipulate the circumstances so that they would in fact not have to pay Charterers any damages in relation thereto.

In their recovery herein, Charterers will give credit if, insofar as and where appropriate for the sum of US$131,261.13 received by way of freight under the contract with Sinoriches.

19.     Charterers expressly reserve their rights to waive Owners' said torts and to elect to claim the proceeds thereof (including but not limited freight received from Farmbridge Ltd and/or Sinoriches) as money had and received to their use.

20.     Further Charterers claim compound interest on the amount found to be due to them

AND Charterers claim against Owners:

(1)     Damages for breach of charter and for tort;

12

(2)    Aggravated and/or exemplary damages for tort;

(3)    Alternatively to the said damages for tort an account of all proceeds received by Owners as a result of the commission of the said torts (including but not limited to freight received from Farmbridge and/or Sinoriches) and an order that Owners do pay Charterers all sums due and owing on the said account as money had and received to Charterers' use;

(4)    Interest on the amounts found to be due to them, pursuant to section 49 Arbitration Act 1996, at such rate(s) and for such period(s) and compounded with such rests as the Tribunal thinks fit;

(5)    Costs

Served this 1st day of August 2007 by Fishers, solicitors for Charterers.

13